Amos A. Alexander *v.* A. H. Polk.

AMOS A. ALEXANDER *v.* A. H. POLK.

39 737
70 648
39 737
73 505
39 737
85 294

1. DEED : INSTRUMENT NOT A DEED UNLESS SEALED.—An instrument, although intended to operate as a deed and purporting on its face to be under seal, is nevertheless not a deed if it be without a seal or a scroll.

2. SAME : PROBATE JUDGE HAS NO AUTHORITY TO TAKE ACKNOWLEDGMENT OF ANY BUT A SEALED INSTRUMENT.—A probate judge has no authority to take the acknowledgment of an instrument not under seal; and if he do so, the acknowledgment will be void, and no proof of the execution of the instrument.

3. SAME : SAME : CASE IN JUDGMENT.—An instrument which was in all respects a deed conveying land, except that it was not under seal, and which was acknowledged before the probate judge and recorded, was offered in evidence, with the certificate of the acknowledgment of its execution and record, to show title to the land in an action of ejectment :—*Held*, that it was inadmissible : 1, because it was not a deed; and 2, because, considering it as a mere contract, there was no proof of its execution.

4. SHERIFF : PROBATE JUDGE'S AUTHORITY TO ADMINISTER OFFICIAL OATH TO.—The probate judges of this State, from the year 1833 to the adoption of the Rev. Code of 1857, were vested by law with the authority to administer official oaths to the sheriffs of their respective counties.

5. EXECUTION : LEVY ON PERSONALTY ONLY PRESUMPTIVE SATISFACTION, WHICH IS REMOVED BY SHOWING PROPERTY OTHERWISE DISPOSED OF.—The levy of an execution on personalty is only presumptive evidence of satisfaction of the execution to the value of the property so seized; but this presumption is rebutted if it appear by the sheriff's return that the property was taken out of his possession by due course of law, and placed in the possession of a receiver in chancery, whether such action was taken at the instance of the defendant or not.

6. SAME : UNDER HUTCH. CODE, PLAINTIFF MAY HAVE TWO EXECUTIONS.—Under sec. 3 of the Act of June 22, 1822, Hutch. Code, p. 899, the plaintiff is entitled to sue out a second execution before the first execution has been executed and returned; and a levy and sale under such second execution is therefore legal and valid. The case of *McGehee* v. *Hundly*, 5 How. Miss. R. 629, cited, and explained not to be inconsistent with this position.

7. CHAMPERTY : WHAT IS.—To constitute the offence of champerty at common law, there must be a knowledge on the part of the vendor, at the time of the sale, of the adverse holding of the land by another. See *Sessions* v. *Reynolds*, 7 S. & M. 161.

8. SAME : SALE AVOIDED ON ACCOUNT OF, ONLY WHEN OFFENCE IS COMPLETE.—A sale of land in the possession of another is not invalid on account of such possession, unless in the sale the vendor be guilty of champerty. See 7 S. & M. 161.

VOL. X.—47

9. SAME: POSSESSION PRESUMED RIGHTFUL: ADVERSE CHARACTER MUST BE SHOWN.—It is a presumption of law that the possession of land is in subordination to, and not in defiance of, the rights of the true owner; it is incumbent, therefore, on the possessor, claiming to hold adversely to the owner, to show the adverse character of his possession; and, in order to do this, he must show that the owner either had actual knowledge of his adverse claim and possession, or that his occupancy and user were so open, notorious, and inconsistent with, as well as injurious to, the rights of the owner, as from these facts to raise a presumption of such knowledge on the part of the owner.

10. SAME: SAME: PRESUMPTIONS ARISING FROM THE QUANTITY OF THE LAND OCCUPIED.—Where knowledge on the part of the owner, of the adverse holding, is sought to be established by the presumption arising from the nature and character of the possession, the quantity or proportion of the land actually occupied becomes material. If the whole tract is occupied and enclosed by a party asserting an adverse claim, the presumption is violent that the owner has knowledge of the adverse character of the claim; but where, on a boundary line between the owner and the adverse claimant, the possession of the latter has been but of a small quantity —a narrow strip along the boundary line, which may as well be attributed to accident and mistake as to design—a knowledge on the part of the owner of the adverse claim would not be presumed.

ERROR to the Circuit Court of Bolivar county. Hon. H. H. Miller, Esq., presiding as special judge.

This was an action of ejectment commenced on the 13th October, 1856, by A. H. Polk, the defendant in error, against Amos A. Alexander, for the recovery of six hundred and forty acres of land situated in said county. Pleas, general denial, and Statute of Limitations, with notice of a claim for the value of improvements made by defendant on the *locus in quo.*

On the trial it was proven that the *locus in quo* was entered by Magnus T. Rogers from the United States government, on the 15th October, 1835, and that patents had afterwards been issued to him therefor. Plaintiff then read in evidence a record of a judgment rendered in the Circuit Court of Yazoo county, on the 14th February, 1838, in favor of Vincent Galloway, against said Magnus T. Rogers, for $4,149.27 and costs of suit, and a deed made by James Patterson, sheriff of Bolivar county, to James Galloway, for the *locus in quo,* dated 15th

April, 1839; and reciting the issuance of an execution on the aforesaid judgment and its levy on the land, and its sale by the sheriff under said levy; and a deed from James Galloway to L. G. Galloway, dated 18th March, 1851, and a deed from L. G. Galloway to plaintiff, dated April 8th, 1854; and here rested his case.

It appears from the record of the said judgment against Rogers that, on the 11th January, 1839, an execution was issued on the same, and delivered to the sheriff of Yazoo county on that day; that on the next day the sheriff levied the same on nine slaves and other personalty, the property of the said Magnus T. Rogers. On the 16th of the same month the following indorsement was made on the execution:

"*The property levied on by virtue of this fi. fa. has been enjoined and the property delivered. P. Buford, sheriff; receiver, B. Yandell, on the 16th day of February,* 1839.

"Thos. Hall, *D. S.,*
"for P. Buford, *Sheriff.*"

On the 21st January, 1839, the sheriff indorsed on it that he had collected that day $2,116 on this execution.

This execution was returnable to the May term, 1839, of the said court.

On the 7th February, 1839, the execution, under which Patterson, sheriff of Bolivar county, sold the land to James Galloway, was issued. It was levied on the *locus in quo* on the 13th March, 1839, and the sale was made 15th April, 1839.

Defendant then introduced Austin Alexander, who testified that he is a son of defendant, who has a plantation adjoining the land in controversy, where the witness resides. Witness went to reside there in December, 1849. The plantation of his father is south of the land in controversy; the house about one-half a mile from the land. There was in 1849 a small clearing on a part of the land in controversy, which was in cultivation by defendant. This clearing amounted to three or four acres, being a narrow strip between his father's land and the land in controversy. In 1853 another narrow strip of about six or seven acres was taken in his father's field off the northeast quarter of

section 30; and in 1854 another small strip was taken off the northwest quarter, section 29. That in 1856, in the month of August, and from that time until late in the fall, his father had deadened about three hundred acres upon the land in controversy, for which he paid one dollar per acre. That wood and rail-timber to make the fence was cut by the overseer and hands of his father on both sides of the line, and used for that purpose. That for the purpose of cutting timber defendant used the land in controversy as he did his other land. Witness run out the line in '53 or '54 between his father's land and the land in controversy, and the clearing on the northeast quarter of section 30 was of some two or three acres, perhaps a little more. · That ever since witness had been in the county he had heard that Mr. Galloway claimed the land. Does not know whether his father knew of Galloway's claim or not, as his father lived in Adams county. His father claimed title to said land ever since he purchased of Mr. Shankle, who overseed for his father in 1848.

The defendant, Amos Alexander, testified that in 1849 he employed Shankle, who had been his overseer, to purchase the land in controversy for him, having heard that Hanna was the owner; that Shankle procured a deed from Hanna, and conveyed the land to witness; gave Shankle a horse for his services. Paid about four hundred dollars for the land. Before he purchased it there was a small part of the land adjoining his own clearing which had accidentally been taken in the field of witness; that the part so cleared was a long, narrow strip of land, nearly a mile long, which was made before he knew where the line run. That in 1853 he cleared six or seven acres in the northeast quarter of section 30, and in '54 six or seven acres in the northwest quarter of section 29. That he had used the land in controversy, for cutting timber, &c., before he had purchased of Shankle, precisely as he had done since his purchase. That since his purchase from Shankle he had claimed the land as his own; had cut timber upon it, and paid the taxes on it. That he did not know positively before 1856 that Galloway claimed the land, though he had heard rumors of it before that time. Has paid taxes upon it ever since he purchased, but believes that

Galloway has done the same. In 1856 had about three hundred acres of the land deadened, for which he paid three hundred dollars.

Defendant then introduced deed from Shankle to himself, dated 7th November, 1849 ; then a deed from Hanna to Shankle, dated 19th December, 1848 ; then an instrument of writing from Rogers to John C. Hamilton, dated January 28, 1836, conveying the land in controversy to Hamilton. This instrument was acknowledged before the probate judge of that county as a deed. The plaintiff objected to this deed, on the ground of a want of seal. This instrument purports on its face to be a deed under seal, but is without a scroll or seal, and was also recorded as such. The objection was sustained and defendant excepted.

Defendant then introduced a copy of the official bond of F. Patterson, sheriff, together with the record of his being sworn into office, by which it appears that the official oath of Patterson as sheriff was administered on the 13th November, 1837, by Joseph McGuire, Judge of Probates of Bolivar county, and moved the court to exclude from the jury the deed from Patterson to James Galloway, on the ground that the deed to Galloway was void, the said Patterson not having been properly sworn into office, because the probate judge at that time had no authority to administer said official oath. This motion was overruled, and defendant excepted.

Defendant then offered to read in evidence a deed of trust from Rogers and wife to Harris and Rowan, made on the 22d January, 1838 ; to which deed of trust the plaintiff objected, and the objection was sustained by the court : to which the defendant excepted.

This was all the evidence offered by defendant. Plaintiffs then introduced the following witnesses:

L. G. Galloway. Witness had always paid the taxes on the land in controversy since the date of Patterson's deed to James Galloway, either as agent for his brother or on his own account; that he lived in Bolivar county, not far from the land in controversy, which he claimed as his own until the sale to plaintiff; that he did not know that any of the land in controversy was in defendant's field when he sold to Polk. Wrote to defendant

that the land belonged to witness; thinks the letter was written in 1852. Saw defendant in '54, and conversed with him about the land. The letter written by him to defendant was referred to in their conversation. Neither witness nor plaintiff knew of defendant being in possession of any of the land at or before the sale to Polk.

—— Ballard, for plaintiff. Witness lived nearer to the land in controversy than the defendant's house. He knew the land. Plaintiff had a plantation north of the land in controversy. Witness knew that Galloway claimed the land, and did not know that defendant was in possession of any of it.

—— Hudson, for plaintiff. Was formerly sheriff of Bolivar county, which office he has not held since 1852. Whilst sheriff he informed defendant that he was paying taxes on land claimed by Galloway. He also informed Galloway of the same fact.

This was all the evidence.

It may be as well to remark that the "flourish" to Rogers' signature to the instrument before referred to, relied on by counsel for plaintiff in error as a scroll, was a mere flourish of the pen, being a prolongation of the mark of the pen from the last letter in Rogers' name, and proceeding from that letter under the signature, and there terminating, as is usual with the signatures of men whose writing is clerkly and ornate.

For the plaintiff, the court charged the jury:

1. "That if they are satisfied from the evidence in this case that the lands in controversy were purchased by Magnus T. Rogers from the United States government in 1835, and if the proof shows that a judgment was rendered against Rogers and the land sold under execution, and the plaintiff shows a title to the land derived from the purchaser at said sale, the jury ought to find for the plaintiff the land in controversy, unless the plaintiff had knowledge, at the time of his purchase, that the land in controversy, or a considerable portion thereof, was in the possession and actual occupancy of defendant."

2. The second instruction had reference to the allowance of the claim for improvements, and is not necessary to be set out.

The court instructed the jury on behalf of defendant:

1. "That if they believe from the evidence that the defend-

ant was, at the date of the deed from James Galloway to Lewis G. Galloway, or from L. G. Galloway to Polk, in the actual adverse possession of the land in controversy, claiming under color title and in good faith, that the plaintiff is not entitled to recover." (Given.)

2. "That to constitute color of title, it is not necessary that the defendant should have a deed of conveyance of any sort from the original enterer of the land, or any one claiming under him; it is sufficient if he introduced in evidence a deed from a person who does not appear to have any title to the land, if he claims under it in good faith; and if he does so claim, his claim extends to the whole land embraced in the deed and beyond his actual occupancy : provided, that the portion occupied be an important quantity of the land, and not an inconsiderable part accidentally occupied." (Given.)

3. The third has reference to the claim for improvements.

4. "That actual adverse possession is notice to the world of such possession."

This last was refused, and the following given in lieu thereof:

"If the jury believe from the evidence that the plaintiff has shown title to the land in controversy, it cannot be avoided, unless the common law offence of champerty is complete; and to complete the offence of champerty it is necessary that the plaintiff should have had knowledge of the actual possession or claim of title to the land in controversy, or some considerable portion thereof."

5. "If the jury believe from the evidence that Patterson, the sheriff who sold the land in controversy to James Galloway, was sworn into office by the judge of probates of Bolivar county in 1837, then the act of said sheriff in making said sale, and his deed to said James Galloway, are void, and they must find for defendant."

This instruction was refused.

There was a verdict for plaintiff for the land ; and allowance to the defendant for his improvements to the amount of four hundred dollars.

The defendant's motion for a new trial was overruled, and he excepted.

Hon. J. S. Yerger, the presiding judge of the court, having been of counsel in the case, H. H. Miller, Esq., was selected to sit as special judge.

*Brooke* and *Smedes*, for plaintiff in error.

The court manifestly erred in ruling out the deed from M. T. Rogers to Hamilton on the ground that there was no scroll or seal attached to the grantor's name. The instrument itself recites a signing and sealing, as does also the acknowledgment. In the original, as also in the copy on the record, there is a flourish at the end of the name and under it. This may have been intended by the grantor as his scroll. The statute does not prescribe any particular form of scroll, or any place where it is to be put. The recital that the instrument has been sealed is sufficient to authorize any mark to be considered by the court as a seal, or intended for one. 2 S. & R. 502; *Wellington* v. *Clarke*, 8 S. & M. The deed was important, both as showing an outstanding title in Hamilton and as a link in the chain of defendant's title. Whether sealed or not, it was also important as showing color of title in defendant.

The court should have ruled out the deed from Sheriff Patterson to James Galloway. The probate judge at that day was not authorized to administer the oath to a sheriff. Hutch. Code, 441. By same Act, p. 442, sec. 5, all the acts of a sheriff, done without having given bond or taken the oath of office, are made void. The Act passed in 1838 or 1839, relied on by plaintiff below, simply validates the election of sheriff in Bolivar and other counties. It does not dispense with the bond or oath of office. The deed, therefore, from the sheriff, which is the foundation of plaintiff's title, was void, and should have been excluded from the jury.

The court erred in its first instruction given for plaintiff. Knowledge of an actual adverse possession on the part of a vendor is not necessary to make a sale champertous. *Ellis* v. *Turner*, 11 S. & M. What a "considerable" portion of a tract of land is, the court below did not inform us; but simply laid down the proposition that, in order to render a sale champertous, the vendor must have had notice that the land or a considerable

portion of it was in possession and actual occupancy of the defendant at the time of sale.

The evidence clearly shows that, at the time of the sale by Galloway to Polk, the defendant was in the adverse possession of it. Several acres had been for a long time cleared and in cultivation, and during the same year about three hundred acres cleared. Hudson, who was sheriff in 1852, informed Galloway that defendant was paying taxes on the land; so that he must have known of his claim. The instructions, therefore, asked for on this point were clearly right, and the court erred in refusing and modifying them.

As to a flourish under the name being sufficient, see 2 S. & R. 502; 1 Dall. 63.

*George L. Potter,* on same side.

1. Two operative executions cannot be predicated on the same judgment; the one last issued is void. *McGehee* v. *Hundley,* 5 How. 629. After one has been sued out, another cannot be issued until the first is returned. *Miller* v. *Parnell,* 1 Eng. C. L. R. 414; 3 Bac. Abr. "Execution," 712.

2. The judgment against Rogers was satisfied by the levy. 34 Miss. R. 293; *Peale* v. *Bolton,* 24 Id. 633; *Smith* v. *Walker,* 10 S. & M. 585; *Kershaw* v. *Planters Bank,* 7 How. 386; *Cass* v. *Adams,* 3 Ohio R. 223; *Miller* v. *Bagwell,* 3 McCord, 429; *Mazzik* v. *Bell,* 2 Bailey, 101; *Duncan* v. *Harris,* 17 S. & R. 436; *Hoyt* v. *Hudson,* 12 Johns. R. 206; *Mountney* v. *Andrews,* Cro. Eliz. 237, 238; *Cameron* v. *Irwin,* 5 Hill, (N. Y.,) 272; *Chile* v. *Bernard,* 5 Dana, 95; *Arnold* v. *Fuller,* 1 Ohio R. 217; *Dego* v. *Vackenbury,* 5 Hill, (N. Y.,) 242; *Hammett* v. *Wyman,* 9 Mass. R. 136; *King* v. *Goodman,* 16 Id. 63.

3. The sale was void, because the sheriff's oath was improperly administered.

*Yerger* and *Rucks,* for defendant in error.

The court did not err in excluding from the jury the instrument of writing purporting to be a deed from Rogers to Hamilton. If offered as a *deed,* it was properly excluded. By inspection it appears to be entirely without a seal, or a scroll in place of a

seal. It is of the essence of a deed that it shall be sealed and delivered. Being then without seal or scroll, it was rightfully excluded if offered as a deed. But if offered as an unsealed written contract of Rogers, it was rightly excluded, because there was no proof of its execution by Rogers or of his handwriting. The acknowledgment purporting to be made before Campbell, judge of probate, by Rogers, is not evidence of execution. The statute makes an acknowledgment and the certificate thereof by the proper officer evidence of the execution of a *deed*, but not of other instruments; and, as this was no deed, it was proper to exclude it as a written contract unless proof was made of its execution by Rogers according to the common law practice.

Secondly. It is objected that the title acquired by James Galloway, on the 15th day of April, 1839, is invalid, because it is said that the execution under which it was made was inoperative, there being another execution at that time, issued to the sheriff of Yazoo county, which had been levied on personal property of the defendant. This objection is made for the first time in this court, and, according to repeated rulings, will not therefore be noticed. Had it been made in the court below, if it contained any *prima facie* validity, it could very easily have been removed at the time; but there is no force in the objection made at any time. The execution to Yazoo county was issued on the 11th January, 1839. The execution to Bolivar county was issued on the 7th day of February, 1839. The slaves levied on in Yazoo county were never sold by the sheriff, but that execution was returned enjoined and slaves delivered to a receiver.

By our statute a party may take out a second execution before the first writ is returned and executed, (Hutch. Code, 899;) and the practice has been universal to take executions at the same time to different counties, the rule on this subject being that the party can have several executions but only one satisfaction.

The levy on personal property is not an actual payment or satisfaction of a debt: it is only constructively so, to prevent wrong. It is deemed a payment only in those cases where, if it were not, the defendant would be twice deprived of his property on the same judgment. In all other instances it is no payment. *Banks* v. *Evans,* 10 S. & M. 57, and cases cited; 4 Id. 135.

In the present case, it is plain there was no satisfaction by the levy on the personalty, because, by the sheriff's return, the sale was enjoined, and the property in the hands of a receiver. In *Bibbs* v. *Jones*, 7 How. 397, this court says, "that a sale made under one execution is not void because of a levy made under another on property sufficient to satisfy it. This would create a presumption of satisfaction, which would, however, be subject to explanation by proof that actual satisfaction had not been obtained. The subsequent execution after such levy might be quashed, but if the defendant take no steps for that purpose, and permits a sale to be made under it, an innocent purchaser obtains a good title."

Third. It is objected that the sale was void because the sheriff had not taken the oath of office. There seems to be no force in this objection. On the copy of the sheriff's bond offered in evidence by the defendants it appears that the bond was approved on the 13th November, 1837, and the oath of office taken by him on the same day before the judge of probates of Bolivar county. It is said that the judge of probates was not the proper person to administer the oath. This we conceive to be a mistake. The Act of June, 1822, Hutch. Code, 441, provides that the sheriff shall take the oath of office "before any justice of the County Court or justice of the peace of the county for which he is chosen, and enter into bond, &c., to be approved by the presiding justice of the County Court." The Act further provided that the presiding justice of the County Court should "indorse on said bond his approbation of the sureties therein named, and a certificate that he has administered to the sheriff the oath of office."

The Act establishing a County Court directed that it should consist of three judges, to wit, probate judge in each county, who was made the "presiding justice" of said court, and two associate justices. Rev. Code, Poindexter, 71. Inasmuch, then, as the probate judge of each county was the presiding justice of the County Court, it was in truth and in fact the probate judge who administered the oath, and approved the bond and made the indorsements thereon.

By the amended constitution, the County Court was abolished, but the office of probate judge was still continued; and the Act

of 27th February, 1836, sec. 2, provided, "That the bond to be given by the sheriff, with his sureties, should be approved by the probate judge of each county, and for the approval and *indorsement* of each bond the judge should be entitled to receive one dollar," &c.    What indorsement is here referred to? Certainly the indorsement specified in the Act of 1822, which declares that he " shall indorse on said bond *his* approbation of the sureties therein named, and a certificate that *he* has administered to the sheriff the oath of office," &c., thus plainly showing that the Legislature, in 1836, understood that the approval and oath of office would be made by the probate judge, he being the party required by that Act to approve the bond and make the indorsement; and such we believe has been the uniform practice in the State.    But, again, if we concede, as contended for on the opposite side, that the probate judge could not administer the oath of office, and that it had to be done by a justice of the peace, that concession by no means establishes the position contended for.

Patterson was elected sheriff in November, 1837; he gave the bond required by law, and he acted in his official capacity.    Now, conceding for the sake of argument that he could not act legally until he took the oath of office, this court is bound to presume, in the absence of proof to the contrary, that he took the oath before entering upon the discharge of his duties.    It is a maxim of the law uniformly applied that every thing will be presumed to have been rightly done by a public officer, in the absence of proof to the contrary.    Is there any proof in this case that the oath of office was not taken in the manner required by law? The defendant introduces the bond, on which there is an indorsement that the oath of office was taken before the probate judge; and he says this officer was not authorized to take the oath: admitted; but does it therefore follow that the oath was not taken before a party authorized to administer it?    Certainly not.    On the contrary, as the sheriff acted in the office, fulfilling all its duties, this court is bound to presume, in the absence of proof to the contrary, that the oath was taken by him before a proper officer. Proof that the oath was taken before the probate judge is certainly not proof that it was not also taken before a justice of the peace.    Every thing will be presumed to maintain the validity

of acts of public officers where third parties are interested, and nothing will be presumed to invalidate them. But the court would, if necessary to maintain the validity of their sheriff's acts, hold that the Act of 19th January, 1839, ch. 3, gave authority to act, and rendered all acts done by him under color of office valid. But, even if the foregoing views were not conclusive of the case, the court would uphold the acts of the sheriff in this case as an officer *de facto*. *Rhodes* v. *McDonald*, 2 Cush. 418; *Ray* v. *Murdoch*, 7 George, 692. The principles in *Alcorn* v. *Shelby* do not conflict with this position; because there Alcorn, the officer, was a party to the suit, and not a third party.

On the champerty question the ruling of the court was in accordance with the decisions of this court. 7 S. & M. 160.

HARRIS, J., delivered the opinion of the court:

The first error assigned is, that the court erred in ruling out the *deed* from Rogers to Hamilton. 1st, it was properly ruled out, *as a deed*, because there was no seal or scroll attached to it; and, 2d, it was properly rejected, as a *contract*, because there was no proof of its execution.

The second ground of error relied on is, that the court erred in overruling the motion to exclude the deed from sheriff Patterson to Galloway.

This *motion in the court below* was founded on the assumption that Patterson was not legally sheriff, and his acts as such officer were void, because the oath of office was administered to him by the judge of probates of Bolivar county, who was not authorized to administer the oath.

By the Act of 1822, under the old constitution, "the presiding justice of the County Court" was required to indorse on the sheriff's bond "his approbation of the sureties therein named, and a certificate that he had administered to the sheriff the oath of office," &c.

By the Act of 28th June, 1822, Poindexter's Code, p. 71, the Legislature, under the provisions of the constitution of 1817, established the "*County Courts*" as inferior courts, making the *judge of probates* in each county "*the presiding justice*" of the

County Court for that county, and providing for the appointment of two associate justices.

By the Act of 26th November, 1821, the Legislature organized the Orphans' Court, under the constitution of 1817, and provided for the appointment of a "judge of probate," "with full jurisdiction of all testamentary and other matters pertaining to an Orphans' Court or Court of Probate in their respective counties."

No oath and no additional qualification was prescribed, by the Act of 28th June, 1822, establishing the County Court, for the judge of probate, in order to constitute him "the presiding justice of the County Court;" but, by virtue of his office as probate judge, he was constituted, under the Act, presiding justice of the County Court. When, therefore, by the provisions of the Act of 1822, (Poindexter's Code, p. 249,) it was made his duty, as "*presiding justice of the County Court*," "to administer to the sheriff the oath of office," no new jurisdiction was thereby conferred upon the *County Court*, but a special, limited authority was conferred upon an *individual*, who, by virtue of his office of probate judge, exercised the duties of "presiding justice of the County Court," and who was properly and accurately designated by either name. His act in approving the bond and administering the oath was not a judicial act, pertaining to the jurisdiction of either the County *Court* or the Probate *Court*, but the act of an *individual* vested with this special authority because of the convenience and permanence of the designation.

If, during the continuance of the County Court under the old constitution, the same individual, holding the office of probate judge, had approved a sheriff's bond, and administered the oath and made certificate thereof, as "*judge of probate*," it would scarcely have been contended that the act was not performed by the "presiding justice of the County Court," and was therefore void, because it was done by the individual designated by the statute, as well known to the law by the one name as the other, and always identical. The distinction is between judicial acts, performed as a court in regular session, and ministerial

acts, performed by an individual under a special limited authority.

It is urged, however, that, by the new constitution, the County Court was abolished, and the power of the judge of probates, to approve the bond and administer the oath, as well as to make certificate thereof, under the Act of 1822, was repealed.

The new constitution (sec. 4 of the "Schedule") provides that "all laws now in force in this State, not repugnant to this constitution, shall continue to operate, until they shall expire by their own limitation, or be altered or repealed by the Legislature." Hutch. Code, p. 51.

The abolition of the County Court in no manner affected the certainty of the individual, the permanence of the designation, or the duty of administering the oath in question. The judge of probate still existed, the same individual to whom the Act requiring the administration of the oath was mandatory, and the provisions of the law in this respect were not repugnant to the constitution, and were not therefore repealed.

That this was the intention of the framers of the constitution, as well as the cotemporaneous construction placed upon its action, is made apparent by the action of the Legislature at its session in 1836, (Hutch. Code, p. 450,) and the practice prevailing ever since.

This Act is an *amendment* of the Act of June 15th, 1822, respecting the appointment and duties of sheriffs. It is the only Act, relating to the oath and bond of the sheriff, touching this question which was ever passed by the Legislature, under the constitution of 1833, until the adoption of the late Code. It does not repeal the former Act. It makes it the duty of the "*probate judge*" to approve the bond; changes the place of filing and recording the bond from the County Court clerk's office to the Probate Court clerk's office; nowhere requires any "*indorsement*" on the bond *directly*, but, referring to the Act of '22, to which it is an amendment, says, "and for the approval *and indorsement* of each bond the judge shall be entitled to receive one dollar," &c., thereby affording the strongest implication that the "*indorsement*" intended is "the certificate that he has administered the oath," &c., as well as his *approval* of the bond, both of

which are required to be *indorsed by him* on the bond by the Act to which this Act is an amendment.

It is, again, insisted that the deed from sheriff Patterson to Galloway should have been excluded, on the ground that, prior to the issuance of the execution under which the sheriff sold the land in question, another execution on the same judgment had been levied on a number of slaves sufficient to satisfy it, which levy was enjoined and the negroes taken out of the hands of the sheriff and placed in the hands of a receiver in chancery. It is urged that in law this was a satisfaction of the judgment, and rendered all the proceedings subsequent thereto void.

It is unnecessary to discuss this point at length here, as it was not made in the court below, and could not therefore avail the plaintiff in error here, even if it were tenable. It may be remarked, however, that under the facts in this record, if the point were regularly before us, it would not change the result; for, under the decisions of this court, notwithstanding the well-settled rule that a levy on sufficient personal property is *prima facie,* in presumption of law, a satisfaction of the execution, yet it is equally well settled that it is always competent to show that there has been no actual satisfaction. *Banks* v. *Evans,* 10 S. & M. 35, and *Smith* v. *Walker,* 10 S. & M. 584. There are only two modes in which such satisfaction could arise by a levy: first, by a sale and actual payment; and, second, by the misconduct of the plaintiff in execution, or the sheriff as his agent, while holding the property by virtue of the execution, whereby the property levied on or a sufficiency to satisfy the execution became lost to the defendant. See also *Walker* v. *McDowell,* 4 S. & M. 135.

In this case the record shows no sale of the negroes levied on, but that they were legally taken out of the possession of the sheriff by an injunction, and placed in the custody of the law, by its receiver in chancery, whether at the suit of the defendant in execution himself or some third party does not appear. It is therefore abundantly shown that no satisfaction was ever had from this levy, as the whole record of this judgment and all the proceedings on it are before us and no *venditioni exponas* appears, or other process, authorizing the sheriff again to take the negroes

into his possession. Other views equally conclusive on this point might be relied on, were it before us for decision.

It is also insisted that the *execution* under which sale was made was void, and consequently the proceedings under it were void, because, *at the time of its issuance,* another execution, predicated on the same judgment, was in progress of being made effectual; and for this the case of *McGehee* v. *Handley et al.,* 5 How. 629, is cited. This was a case of a levy and *valuation,* under the valuation law, and a *second levy,* before the expiration of the twelve months provided as a stay by the Act. The court, in deciding that this second levy was illegal, cite some general principles as of common law origin, without undertaking to hold that, under our statute, (Hutch. Code, p. 899,) authorizing the issuance of a second execution where the first is not returned and executed, the issuance of a second execution under the circumstances presented in this case is void against an innocent purchaser, without notice of the first levy ; no such question was before it. This point, however, like the other, was not made in the court below, and could not, therefore, even if well taken, be ground of reversal here.

The only remaining assignments relate to the instructions, and the refusal to grant a new trial; and in neither respect are the assignments well taken.

The case of *Sessions et al.* v. *Reynolds,* 7 S. & M. 161, is conclusive of the correctness of the first instruction asked by the plaintiff below and given by the court. That instruction substantially directed the jury that, if the plaintiff in ejectment showed in himself a perfect title to the land in controversy, the jury should find a verdict in his favor, "unless the plaintiff in ejectment *had knowledge* that the land, or *a considerable portion thereof,* was in the possession and actual occupancy of the defendant at the time of his purchase."

It is insisted that this charge was erroneous, *first,* because "*knowledge* of an actual adverse possession on the part of a vendor is not necessary to make a sale champertous." The case of *Ellis* v. *Doe ex dem. Turner,* 11 S. & M. 422, is relied on by counsel for the plaintiff in error in support of this position. An examination of that case will show that this point did not occur,

and was neither discussed nor decided there. The general principle of the common law—that a party out of possession of real estate, which is held *adversely* by another, under a title, though it be imperfect, cannot sell, so as to pass a good title to his vendee—is held in this case to be in force in this State; but there is nothing in the case inconsistent with the decision of the same distinguished jurist in the previous case of *Sessions et al.* v. *Reynolds,* 7 S. & M. 161. In that case the question arose directly. In discussing the reason of the rule at common law just stated, as existing in this State, and after stating that we have no such statute as that of the 32d Henry 8, c. 9, which prohibited the sale or purchase of land unless the vendor had received the profits thereof for one year next preceding the sale, the court proceeds to show that, in order to avoid the sale made by a vendor out of possession on that account, the common law *offence* of champerty must be complete; for it is because of the *offence* that the sale is void; "and if there be no offence," says the court, "the sale is valid." If the parties act innocently in consequence of an entire ignorance of the adverse possession, then there could be no offence—no champerty. "To constitute champerty it is necessary to prove something more than that part of the land was claimed by another. The purchaser should have some *knowledge* of the *adverse* claim."

It is insisted, second, that this instruction was erroneous because of the uncertainty of the language—"or a considerable portion thereof"—used in the instruction. The instruction, in this respect, asserted that the plaintiff was entitled to recover upon the hypothesis stated—"unless he had knowledge that the land in controversy, *or a considerable portion thereof,* was in the possession and actual occupancy of the defendant at the time of plaintiff's purchase." What is here meant by a "considerable portion" of the land, if not sufficiently clear, is fully explained in the proviso to the second instruction given for defendant below, where it is said that a claim, under a deed constituting color of title, extends to the whole land embraced in the deed, and beyond actual occupancy: *provided* that the portion occupied be an important quantity of the land, and not an inconsiderable part accidentally occupied."

The reason why lands *adversely held* cannot be sold by the real owner while he is out of possession by the *modern* doctrine, originates in the general rule of law forbidding the assignment of a chose in action, or a mere right of action.

The possession which is relied on to defeat a conveyance by the real owner must be *adverse;* that is, it must be openly and notoriously in defiance of the actual title, and such as converts the estate into a mere right of entry or action; to effect which, nothing short of ouster or disseisin will serve. *Zellers, lessee,* v. *Eckert,* 4 How. U. S. R. 289.

The term "*adverse possession*" designates a possession in opposition to the true title and real owner, and it implies that it commenced in wrong—by ouster or disseisin—and is maintained against right. The law, on the contrary, presumes that every possession is rightful and consistent with, not in opposition or "*adverse*" to, title and ownership. A party, therefore, who relies upon "*adverse possession*," in order to rebut this presumption of possession consistent with the title of the real owner, must prove his possession to be "*adverse*" to the title set up; *Jackson* v. *Sharp,* 9 Johns. 163; Ld. Raym. 329; that is, he must show the actual knowledge of the real owner that he claims in opposition to, and defiance of, his title, or he must show such an occupancy and user, so open and notorious, and inconsistent with, as well as injurious to, the rights of the true owner, that the law will authorize, from such facts, *the presumption of such knowledge* by the true owner.

It is not the mere occupancy or possession which must be known to the true owner, to prejudice his rights; but its "*adverse*" character. Where, therefore, "*knowledge*" is a matter of presumption, to be inferred from the character of the possession, the *quantity* held becomes material. If the whole tract in controversy is cleared and occupied by the party claiming to hold *adversely*, the presumption is violent that the real owner has "*knowledge*" of the "adverse" and defiant character of the claim; but where, on a boundary line between the real owner and the adverse claimant, the possession has been of a small quantity—a very narrow strip, as well attributable to accident as design—a jury would scarcely be warranted in presuming,

from such evidence, that the true owner had knowledge of the "*adverse*" character of such possession.

In this view the instruction was properly given, and, with the other instructions before them, could not have been misunderstood by or misled the jury.

Judgment affirmed.