BROWN *v.* JARRATT, PHILLIPS, et al.

No. 39916 June 4, 1956 87 So. 2d 874

340

*Clifton & Mack,* Memphis, Tennessee; *Paul H. Bowdre,* Hernando, for appellant.

*Chatham & Walker,* Hernando, for appellees.

342

Kyle, J.

The appellees, R. S. Jarratt and J. R. Phillips, Jr., and others, doing business as Phillips Lumber Company, complainants in the court below, filed separate suits in the Chancery Court of DeSoto County against the appellant, Guy I. Brown, defendant, seeking the cancellation of the defendant's claims to certain lands in DeSoto County as clouds on their titles, and also asking for injunctive relief and damages against the defendant on account of alleged trespasses committed by the defendant on said lands. After the filing of the defendant's answers, the two cases were consolidated by agreement of the parties for hearing before the chancellor, but separate decrees were entered at the conclusion of the hearing. The cases have been consolidated for hearing on this appeal.

The complainant, R. S. Jarratt, in his bill alleged that he was the owner in fee simple of the land lying

in DeSoto County, Mississippi, described as "The entire fractional Section 20, Township 1, Range 10 West, containing 140 acres more or less, and in addition thereto all accretions to said fractional section formed by the Mississippi River on the west side of said section." The complainants, J. R. Phillips and others, in their bill alleged that they were the owners in fee simple of the lands lying in DeSoto County, Mississippi, described as "all of fractional part of Section 16, Township 1, Range 10, and all of fractional part of Section 17, Township 1, Range 10, less one-half of the oil, gas and other minerals on said land reserved to Dr. H. G. Rudner by deed dated November 10, 1950, in Record Book 38, page 72, in said county."

The above described lands are situated in the Cow Island area in the northwest corner of DeSoto County. The Phillips lands in Sections 16 and 17 are bounded on the north by the Mississippi-Tennessee State Line, and on the west by the Mississippi River. The Jarratt land in Section 20 lies immediately south of the Phillips land in Section 17, and is bounded on the west by the Mississippi River, and on the east by Rocky Chute.

The complaint Jarratt alleged in his bill, and the record shows, that, when the original government survey was made in 1834 and 1835, fractional Section 20, Township 1, Range 10 West, contained only 68 acres of land; but since that time the Mississippi River has gradually changed its course and has moved westward about 1½ miles leaving deposits of soil along the east bank of the river, so that at the present time said fractional Section 20 and its accretions contain 1000 acres of land, more or less. And similar accretions have been added to fractional Section 17 which contained originally only 267 acres. The changes in the course of the river have been non-avulsive gradual changes which have taken place over a period of more than 100 years.

The complainant Jarratt deraigned title to the land in fractional Section 20 from K. R. Armistead, who had ac-

quired title to the land from Anderson-Tully Company, a Michigan corporation, by warranty deed dated July 3, 1916. The complainant alleged that K. R. Armistead conveyed the lands to Roan and Maggie Perkins on December 18, 1916, and that Roan and Maggie Perkins had continued to own the land until their deaths; that Roan Perkins died in 1936, and that Maggie Perkins died in 1946; and that the complainant had acquired title to the land by purchase from their heirs and devisees on July 18, 1952. The complainant alleged that Roan and Maggie Perkins owned the entire fractional Section 20, including the accretions thereto, and occupied the land and claimed it as their own until their deaths; that their occupancy of the land was hostile, open and notorious, exclusive and continuous, under claim of ownership during the entire time, and that after their deaths their heirs and devisees, who were the complainant's immediate grantors owned and occupied the land, claiming it as their own, until the date of their conveyance of the land to the complainant, and that their occupancy of the land was likewise hostile, open and notorious, exclusive and continuous, under claim of ownership. The complainant alleged that on May 9, 1953, the defendant had filed for record in DeSoto County, Mississippi, an ambiguous deed from Mrs. Eva A. Marley and others, heirs and devisees of K. R. Armistead, deceased, and his wife, Mrs. Oribia V. Armistead, deceased, dated November 22, 1949, which purported to convey to the defendant all their right, title and interest in said land, along with other lands, in Shelby County, Tennessee, which were conveyed to the defendant with covenants of general warranty; and that the defendant since recording his deed in Mississippi had undertaken to pasture cattle on the land and had erected a fence across the north part of the land, and had committed numerous trespasses on the land. The complainant, in his prayer for relief, asked that the defendant's claim to the land under and by virtue

of the above mentioned deed dated November 22, 1949, a copy of which was attached to the bill of complaint, be cancelled as a cloud upon the complainant's title, and that the defendant be enjoined from trespassing on said land, and that the complainant be awarded damages for the trespasses already committed.

The complainants, J. R. Phillips, Jr., and others, in their bill deraigned title to the fractional parts of Sections 16 and 17, in DeSoto County, from one P. B. Marshall, who had acquired title to the fractional Section 16 by a forfeited tax land patent from the State of Mississippi, dated July 21, 1926, and who had acquired title to the fractional part of Section 17 by a tax collector's deed from J. S. Campbell, Tax Collector of DeSoto County, dated June 2, 1930. The complainants' deraignment of title showed that P. B. Marshall died intestate in 1934, leaving as his only heirs at law his widow, Mrs. Rebie Marshall, and his daughter, Miss Hazel Marshall, who thereafter conveyed said lands to Dr. H. G. Rudner by deed dated November 27, 1937; and that the complainants had acquired title to the lands by a deed of conveyance from Dr. Rudner dated November 10, 1950. The complainants alleged in their bill that they and their predecessors in title had been in actual adverse possession of the lands described as fractional Sections 16 and 17 and the accretions thereto, as successive owners thereof, under color of title, from 1932, until the time of the filing of their bill of complaint. The complainants then alleged in much the same manner as Jarratt had alleged, that on May 9, 1953, the defendant had filed for record in DeSoto County a deed signed by Mrs. Eva A. Marley and others, which purported to convey to the defendant the above mentioned lands in Sections 16 and 17, and that since that time the defendant had grazed cattle on the lands without the complainants' permission, and had committed numerous trespasses on the lands; and the complainants asked that they be adjudged to be the true

owners of the lands described in their bill, and that the defendant's deed from Mrs. Eva A. Marley and others be cancelled in so far as it attempted to convey to the grantee therein named the lands described in the complainants' bill, and that the defendant be permanently enjoined from trespassing upon said lands, and that the complainants be awarded damages for the trespasses already committed.

The defendant, Guy I. Brown, in his answer to the bill of complaint filed by the complainant Jarratt, denied that the complainant was the owner of all of fractional Section 20, including the accretions. He denied that Roan and Maggie Perkins, through whom the complainant claimed title, had extended their occupancy or claim of title to the accretions formed by the gradual changes in the Mississippi River, or that they had acquired title to the accretions by adverse possession. The defendant denied that the complainant had acquired title to any part of the land in Section 20 other than 140 acres mentioned in the deed from K. R. Armistead to Roan and Maggie Perkins; and the defendant averred in his answer that he was the owner of that part of the land in Section 20 which was embraced within the calls of his deed from Mrs. Eva A. Marley and others dated November 22, 1949. The defendant also averred in his answer, that if the complainant was claiming land "beyond the recognized and agreed boundary line described in the deed from K. R. Armistead to Roan and Maggie Perkins," he was barred from maintaining his suit by the ten year statute of limitations, Section 709, Code of 1942. The defendant averred that it might be that the complainant was claiming title to some of the lands owned by the defendant in Shelby County, Tennessee, and if that were true the complainant could not maintain his suit for the reason that his bill showed that he only claimed lands in DeSoto County, Mississippi.

The defendant, in his answer to the bill filed by the complainants J. R. Phillips, Jr. and others, denied that the complainants were the owners of the lands in Sections 16 and 17 described in the bill of complaint, or that they or their predecessors in title had been in possession of the lands for the statutory period of ten years. The defendant averred that the lands were owned by K. R. Armistead at the time of his death, and that the defendant acquired title to the same under and by virtue of the deed executed by Mrs. Eva A. Marley and others on November 22, 1949.

The causes were heard by the chancellor upon the pleadings and oral testimony, depositions and exhibits. The hearing was extended over a period of several weeks, because of the intervention of regular terms of the chancery court in other counties of the chancery district. The question as to the location of the Mississippi-Tennessee State line was raised at the outset, and the testimony and the exhibits offered on behalf of the respective parties make a record of approximately 1000 pages. As we have already stated, the bills alleged that the lands described therein were situated in DeSoto County, Mississippi, and the complainants' contention throughout the trial was, that the state line was located 17½ chains north of the south boundary line of Sections 16 and 17, in Township 1, Range 10 West. The defendant contended, however, that the state line was located south of the above mentioned section line and that all of Sections 16 and 17, except approximately one acre, and a fractional part of Section 20 were in the State of Tennessee.

At the conclusion of the hearing the chancellor found that the state line between Mississippi and Tennessee, was located 1155 feet (17½ chains) north of the south boundary line of the tier of sections 13 to 18, in Township 1, Range 10 West, and that all of the lands involved in the two suits that were being tried were situated in DeSoto County. The chancellor found that the com-

plainant Jarratt was the owner in fee simple of the entire fractional Section 20, Township 1, Range 10 West, containing 140 acres, more or less, and in addition thereto all accretions to the fractional section formed by the Mississippi River on the west side of the section, and that the defendant Brown had no right, title or interest therein. The chancellor therefore ordered that the claim asserted by the defendant Brown be cancelled, and that the defendant be permanently enjoined from interfering with the complainant's peaceful use and possession of said land, and that the complainant have and recover from the defendant the sum of $600.00.

The chancellor found that the complaints, J. R. Phillips, Jr., and others, were the owners of the fractional parts of Sections 16 and 17 lying south of the state line as located above, being the south 140 acres of Section 16 and the south fractional part of Section 17 lying south of the state line extending westwardly to the Mississippi River, and the accretions thereto lying south of the state line. The chancellor found that the complainants and their predecessors in title had been in adverse possession of and had exercised acts of ownership over the above mentioned fractional parts of Section 16 and 17 and accretions thereto in Mississippi for more than ten years, under perfect legal title, and that the defendant and his predecessors in title had had no legal possession of said land; and the chancellor entered a decree in the Phillips case similar to the decree entered in the Jarratt case, except that no damages were awarded to Phillips for the alleged trespasses already committed. From the decree thus entered the defendant Brown has prosecuted this appeal.

The first point argued by the appellant's attorneys as ground for reversal on this appeal is that the chancellor erred in holding that the state boundary line between the States of Tennessee and Mississippi (See Article 2, Section 3, Mississippi Constitution of 1890), in the area in

which the lands in controversy were situated, was 1155 feet north of the south boundary line of Sections 16 and 17; and that the court erred in holding that the lands claimed by Phillips, being the south 140 acres of Section 16 and the fractional part of Section 17 lying south of the state line, and the accretions thereto, and all of the land claimed by Jarratt, being all of fractional Section 20, were in Mississippi.

██ █ We think there was no error in the chancellor's finding that the state line, in the area in which the above mentioned lands were situated, was 1155 feet north of the south boundary line of Sections 13 to 18, inclusive, and that all of the lands described in the bills of complainant in these causes were situated in DeSoto County.

It is clear from the testimony of the complainants' witnesses and the testimony of the defendant's witnesses that the line located 1155 feet north of the south boundary line of the tier of Sections 13 to 18, in the Cow Island area, has been recognized for many years by the State and county officers and the people residing in the area as the boundary line between the two states. James P. Tipton, Chancery Clerk of DeSoto County, testified that he had served as tax assessor of the county for a period of eight years and as chancery clerk for a period of eleven years, and that the south 140 acres of the tier of Sections 13 to 18, in Township 1, all across DeSoto County, had always been considered as being in Mississippi and had been assessed for taxes in DeSoto County, and that conveyances of lands in the south part of those sections were recorded in DeSoto County. The witness testified that the assessment rolls of the county for the years prior to 1923 had been destroyed by fire when the courthouse burned in 1922 or 1923, but the assessment roll for the years 1923 and 1924 showed the land described as the east part of Section 20, Township 1, Range 10, 140 acres, assessed to Roan Perkins. The witness testified that the land described as Section 16, Township 1, Range 10 had

been assessed on the land roll for the years 1923 and 1924 to the State of Mississippi, and that the fractional Section 17, Township 1, Range 10, 69 acres, had been assessed to R. E. L. Morgan. It was also shown that P. B. Marshall obtained a forfeited tax land patent from the State in 1926 to the fractional Section 16, and that the tax collector of DeSoto County sold the fractional Section 17 to P. B. Marshall on June 21, 1930, for taxes due and unpaid for 1929. The assessment rolls for the next succeeding twenty-five years' showed the assessment of the lands in the three sections to the proper owners thereof.

H. P. Sullivan, who owned land in Section 18, Township 1, Range 9 West, and adjoining sections, testified that he had owned the land in Section 18 adjoining the Mississippi-Tennessee state line for a period of 20 or 25 years; that the distance from the state line to the south boundary line of the section was between 1100 and 1200 feet; that he had paid taxes on the land in Section 18 to the tax collector in DeSoto County, and had never paid taxes on the land in Tennessee. T. P. Howard, who lived about five miles west of Walls, testified that he owned 1400 acres of land, including a strip of land in Section 14, lying immediately south of the Mississippi-Tennessee state line, and that the total acreage in that strip was 140 acres, but the levee board had taken off two small pieces leaving him about 125 acres, which was assessed to him in DeSoto County and upon which he paid taxes in DeSoto County. He stated that the distance from the south line of section 14 to the state line was about 1150 feet.

Jessie Harris, a civil engineer of Memphis, Tennessee, who had had 18 years of experience with the government as an engineer, testified that he was familiar with the Cow Island area, and that he was familiar with the maps used by the U. S. Engineers in the Memphis district. Harris identified a General Hydrographic Survey Map

of the Cow Island area which was issued in 1953, and several other maps which had been issued by the Corps of Engineers within recent years. He was questioned especially about the location of the state line as shown on the hydrographic map mentioned above and a quadrangle map of Horn Lake, both of which showed the Mississippi-Tennessee State Line. He testified that the state line as shown on each of the maps ran across Sections 16 and 17 approximately 1500 feet north of the south boundary line of Sections 16 and 17.

Noel T. Clarkson, field supervisor of game wardens for the Mississippi Game and Fish Commission, testified that he was present when the state line in the Cow Island area was run by R. L. Cooper, a civil engineer of Memphis, during the latter part of February 1952; that Cooper had a small map of the line that he had made when he surveyed the line in 1926; and that the surveying party which ran the line in 1952 found the old trees and hack marks which Cooper identified as the state line that he had run in 1926, and that the line was located 1155 feet north of a tree that Cooper had marked in 1926. Clarkson stated that the surveying party ran the state line westwardly to the river bank, and they found old hack marks in the big timber along the line.

Ernest Nelson, who testified as a witness for the defendant, stated that he helped carry the chain for the surveying party when the state line was run by Mr. Cooper for the Game and Fish Commission; that he showed Mr. Cooper the starting point and when they reached the state line they found the old blaze marks, which were about 1100 or 1200 feet north of the Roan Perkins' line. Nelson stated that the line running west to the river was "pretty plain."

R. L. Cooper, a civil engineer and surveyor of long experience, who testified as a witness for the defendant, stated that until the last year he had always considered the state line as being located 1155 feet north of the

south line of Sections 16 and 17, and that he had always used that figure when he had work to do north or south of the state line. He had obtained his information that the state line was located 1155 feet north of the south line of the tier of Sections 13 to 18 from S. W. McCleskey, a well known civil engineer and surveyor of Memphis, in 1926, when Mr. McCleskey had him run the line. He had obtained information to the same effect from a survey that had been made by St. George Richardson, another civil engineer and surveyor of Memphis. Cooper stated also that the surveys of the Crump lands, lying immediately south of the Phillips' land, made by Mr. McCleskey in 1916, showed that the state line was 1155 feet north of the section line.

The court also admitted in evidence, over the defendant's objection, a map of the K. R. Armistead lands, consisting of 1643.3 acres in Sections 8, 9, 10, 16 and 17, in Township 1, Range 10 West, in Shelby County, Tennessee, prepared by St. George Richardson, Civil Engineer, in February 1942, which showed the state line located 17½ chains (1155 feet) north of the south boundary line of Sections 16 and 17.

The only testimony of a substantial nature offered on behalf of the defendant to sustain his contention that the state line was located south of the southern boundary line of Sections 16 and 17 was the testimony of R. L. Cooper, the civil engineer mentioned above, who testified that he had made a study during the last year, at the request of the defendant's attorneys, of the field notes and the plat of the survey made by the commissioners who ran the state line for the states of Tennessee and Mississippi in 1837, and from the information gained from that study he had been able to reconstruct the line run by the commissioners, and had found that the commissioners' line was not located 1155 feet north of the southern boundary line of Sections 13 to 18, as he had been taught to believe, but that the commissioners' line ran much closer

to the south line of Sections 13 to 18 as it approached the Mississippi River and actually crossed over the south line of Section 16 and intersected the east line of Section 20 at a point approximately 93 feet south of the southwest corner of Section 16. Cooper exhibited to the court a plat made by him which showed his own reproduction of the commissioners' line beginning at the Tennessee River and running westwardly 117 miles to the Mississippi River, with tie-ins to points on the so-called "Thomson line", which is delineated on the government township maps (whether accurately or not, we have no way of knowing) as "Tennessee New State Line", and tie-ins with the section lines as shown on the township maps, taken from the field notes of the commissioners' survey. Cooper stated that from his study of the field notes and plat of the commissioners' survey he had found nothing to indicate that the line run by the commissioners, as it approached the Mississippi River, was 1155 feet north of the south boundary line of Sections 13 to 18.

On cross-examination Cooper was asked whether he had ever examined the physical objects or monuments referred to in the commissioners' field notes and plat, and the lakes, ponds and streams shown on the township maps of the Chickasaw Survey. He said that he had not. He admitted that the commissioners' plat showed the location of the various roads, streams and lakes that they crossed, and that it would be possible for an engineer to take the plat and the township maps and locate the commissioners' line with some degree of accuracy; but he had not undertaken to do that. He did not know of course at what point the commissioners reached Rocky Chute in 1837. Cooper admitted that he had found no reference in the field notes of the commissioners' survey that indicated that the commissioners crossed the south line of Section 16. He stated that he had based his previous surveys of the state line on the northeast corner of Section 20, which he had had some

one point out to him. He stated that he had made no independent investigation to determine the correctness of the starting point. Cooper admitted that his present testimony about the state line was contrary to all that he had learned about the state line during his past thirty years as a surveyor, and that it was contrary to what reliable surveyors and engineers operating in the vicinity of the state line understood and accepted as to the true location of the state line, and that it was contrary to what people on both sides of the state line had understood and accepted for a long period of time.

■■ ■ Neither the Chancery Court of DeSoto County nor this Court has jurisdiction or power to establish a line between the States of Mississippi and Tennessee. ■■ ■ Such a line must be established either by compact of the sovereign states themselves, or by judicial proceedings, and, if by judicial proceedings, then by a decree of the United States Supreme Court. That court by Article 3, Section 2, of the United States Constitution has original and exclusive jurisdiction over such an issue. Virginia v. Tenn., 148 U. S. 503, 37 L. Ed. 537, 13 S. Ct. 728. But the Chancery Court of DeSoto County, in suits between private parties, such as we have here, had a right to adjudge the actual location of lines affecting the boundaries of their lands. McCarty v. Carolina Lumber Company, 134 Tenn. 35, 182 S.W. 909. ■■ ■ The question which the chancellor had to decide upon the original hearing, however, and the question that we have to decide on this appeal, so far as the state line is involved, is the question as to where the state line is, not where it ought to be.

■■ ■ It is well settled that a boundary line between states which has been run out, located, and marked, and which thereafter has been recognized and acquiesced in by the states in question for a long course of years, is conclusive, even though it is later ascertained that the line thus located and marked varies somewhat from the

courses given in the original plat. 49 Am. Jur. 239, States, Territories, and Dependencies, par. 19, and cases cited.

In the case of Oklahoma v. Texas, 272 U.S. 21, 71 L. Ed. 145, 47 S. Ct. 9, the Court said:

"It is well settled that governments as well as private persons, are bound by the practical line that has been recognized and adopted as their boundary. (Missouri v. Iowa, 7 How. 660, 670, 12 L. Ed. 861, 865; New Mexico v. Colorado, 267 U.S. 30, 40, 69 L. Ed. 499, 502, 45 S. Ct. Rep. 202); and that a boundary line between two governments which has been run out, located and marked upon the earth, and afterwards recognized and acquiesced in by them for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the correct course; the line so established, taking effect in such case, as a definition of the true and ancient boundary. (Virginia v. Tennessee, 148 U.S. 503, 522, 37 L. Ed. 537, 544, 13 Sup. Ct. Rep. 728; Maryland v. West Virginia, 217 U.S. 1, 42, 54 L. Ed. 645, 658, 30 Sup. Ct. Rep. 268 New Mexico v. Colorado, supra, 40)."

The boundary line involved in these cases was run out in 1837 by the commissioners appointed by the states of Mississippi and Tennessee for the purpose of settling a border controversy that had existed among the settlers, and later between the two states, for a period of several years, concerning the true location of the 35th degree of north latitude, which had been fixed by an act of Congress as the southern boundary of the State of Tennessee. The Governor of the State of Tennessee had appointed John Thomson in 1831 to ascertain the true location of the line, and Thomson had made a survey and run a line during the months of July and August 1833. But Thomson's line was never recognized by the State of Mississippi, for the reason that Mississippi had not

been represented in the making of the survey. The joint commission was appointed in 1837 to ascertain the true location of the boundary line between the two states and to run out and mark the line. The commissioners made their survey during the months of August, September and October 1837, and filed their reports with the governors of the two states a few weeks later; and the line run out and marked by the commissioners was ratified and approved by the legislatures of the two states immediately thereafter. See Hutchinson's Mississippi Code of 1798-1848, p. 62, Chapter 7, Public Acts of Tennessee, 1837-38.

The commissioners' field notes show that the line run out by them was marked by reference trees, the reference trees on the north side of the line being marked with a "T" for Tennessee and those on the south side with an "M" for Mississippi. No permanent markers of stone or metal appear to have been set up. The reference trees have probably long since disappeared. But the line thus run out and marked settled the boundary line controversy; and that line has been recognized and accepted by the two states for a period of 118 years and must be accepted by us as conclusive, even if it varies somewhat from the courses defined in the field notes of the commissioners' survey.

We have made a careful study of the testimony of the witnesses and the points argued in the briefs, and we are convinced that the chancellor was correct in his finding that the state line in the area involved in these cases was located 1155 feet north of the south boundary line of Sections 13 to 18. We are fortified in this conclusion by the testimony of the appellant's own witness, R. L. Cooper, who frankly stated that the line thus located had been recognized as the boundary line between the two states by every surveyor who had done work in the Cow Island area during the last forty years, so far as he knew. It should also be noted that the appellant produced no evi-

dence as to tree markers or other physical objects refer-
red to in the commissioners' field notes, or old blazes or
hack marks left by later surveyors, to support his claim
that the commissioners' line crossed over the south boun-
dary line of Sections 13 to 18 at some point east of Rocky
Chute. The last reference in the field notes to the sec-
tion lines shown on the township maps shows that at the
78th mile running westwardly from the Tennessee River
the commissioners' line crossed the range line between
Ranges 3 and 4 West at a point 17.25 chains north of
the section line.

It is next argued on behalf of the appellant
that the court erred in refusing to admit in evidence cop-
ies of the tax assessor's records of Shelby County, Ten-
nessee, for the years 1906 to 1948, which were offered
in evidence as a part of the appellant's proof that the
line located 1155 feet north of the southern boundary of
those sections had never been recognized by the State
of Tennessee as the southern boundary of that state.
But we have examined the tax assessor's records re-
ferred to, and we find no assessments of lands that can
be identified as lands owned by K. R. Armistead lying
along the south side of Sections 16 and 17, or along the
north side of Section 20, in Township 1, Range 10 West.
Neither does it appear that K. R. Armistead was as-
sessed with any land in the 13th Civil District of Shelby
County that was bounded on the south or on the east by
lands owned by Roan Perkins and Maggie Perkins, or
their heirs, or any land that was bounded on the south
by the Crump lands, which included Section 21, lying im-
mediately south of Section 16. For that reason the copies
of the assessments would have been of no value as evi-
dence in these cases, if the copies had been admitted.

The appellant also argues that the court erred
in refusing to admit in evidence copies of the records of
certain land deeds and other instruments affecting the
title to lands in Sections 16, 17 and 20, recorded in Shelby

County, Tennessee, but not recorded in Mississippi, and which the defendant offered in evidence for the purpose of refuting the appellees' claim that the line located 1155 feet north of the south boundary line of Sections 13 to 18, in Township 1, Range 10 West, had been generally recognized as the true boundary line between the States of Tennessee and Mississippi by property owners in the area affected for a long period of time. But the only probative value those records would have had in these cases would have been to show that for many years after the commissioners' line was run property owners who resided outside of the area affected continued to be misled by the notation on the township maps of the line designated as the "Tennessee New State Line", running alongside and only a few chains south of the south boundary line of Sections 13 to 18, which it is admitted was not the state line run out by the commissioners in 1837. The admission of the copies of the instruments would have had no effect upon the final decision in these cases; and if there was error in the chancellor's refusal to admit the copies in evidence, such error was harmless.

 It is next argued that the court erred in refusing to admit in evidence copies of the records of the proceedings of the Chancery Court of Shelby County, Tennessee, in the cases of J. A. Anderson, Administrator of W. A. Dooley, deceased, v. Mrs. Mary Dooley et al. (1880), Cause No. 3197; W. H. Grimes v. H. W. Mosby and A. L. Perryman (1898), No. 11,008; and James Henderson and Julia Rainey Henderson v. K. R. Armistead and Colonial & United States Mortgage Company, Ltd. (1916), No. 21,222. The appellant argues that the records of the proceedings of the chancery court in those cases would have shown that the Tennessee courts in at least two of the cases had reached conclusions concerning the true location of the boundary line between the two states which differed from the conclusion arrived at by the chancellor in these cases; and that the record

evidence of the proceedings in those cases was competent to disprove the complainants' claim that the line located 1155 feet north of the south boundary line of Sections 13 to 18 had been generally recognized since 1837 as the true boundary line between the two states.

This assignment of error requires a more detailed discussion by us in this opinion.

The case of J. A. Anderson, Administrator, v. Mrs. Mary Dooley et al. (1880), was a proceeding by the administrator for a sale of the lands owned by the decedent for the payment of debts. The administrator's petition alleged, and the court found, that the debts owed by the decedent and still unpaid amounted to $7,627.62, and that it was necessary that the lands be sold for the payment of the debts. The land owned by the decedent at the time of his death consisted of a tract containing 42½ acres in Shelby County, described as a fractional part of the E½ of Section 16, Township 1, Range 8 West, and 1315 ¾ acres of land described as fractional Section 16, containing 377 acres, fractional Section 17, containing 471 acres, and fractional Section 18, containing 467¾ acres, in Township 1, Range 9 West, on what is known as the "Horn Lake Island", in Shelby County. The court ordered that all of the lands be sold to satisfy the outstanding debts and charges against the estate. The lands were duly advertised and bids were received therefor, as provided in the decree, but before a final decree was entered, a question arose as to whether some parts of the lands were situated in the State of Mississippi, and the court ordered that the lands be surveyed for the purpose of determining whether any portion of the fractional Sections 16, 17 and 18, in Township 1, Range 9 West, was in the State of Mississippi. The survey was made during the month of October 1882, and the surveyors reported to the clerk and master that they had found that no parts of the lands were in Mississippi, but all of the lands were in Tennessee. The surveyors at-

tached to their report a copy of a plat of the lands in Township 1, Range 9 West, and a copy of the field notes taken from the records at Hernando. The plat appears to have been a reproduction of the township plat of the government survey, with a line drawn across the north side of Sections 19 to 24 and the words "State Line" inscribed above it, the word "Thompson" being stricken out. The clerk and master incorporated the report of the surveyors in his own report to the court, and on December 23, 1882, a final decree was entered confirming the report and vesting title to the lands in the purchasers.

The case of Grimes v. Mosby et al. was a suit by Grimes against Mosby and Perryman for injunctive relief and for the recovery of damages for the wrongful cutting of timber on lands situated in the 13th Civil District of Shelby County, Tennessee, in Township 1, Range 10 West, which were described in the bill of complaint by metes and bounds, and as "being all of Section 16 and fraction of Sections 20, 21, 22, 23 and 24," all lying in Shelby County, and containing 1265 acres. After the filing of the defendants' answer the case was referred to a master to hear proof and report back to the court his findings as to "the location of the true state line between the States of Mississippi and Tennessee through the lands in controversy, and the amount and value of timber cut by the defendants on the lands in controversy north of said true state line." We do not have before us the entire record. But we do have before us the depositions of the complainant Grimes and the defendant Perryman and the deposition of several other witnesses who testified during the hearing, including the deposition of H. N. Allen, a civil engineer and surveyor, who made a survey of the strip of land in Section 21 which was claimed by the complainant Grimes as a part of the land in Shelby County on which the trespasses had been committed.

The complainant Grimes testified that he based his claim to the lands involved in the controversy upon a

grant from the State of Tennessee which he had obtained in 1897, and that he had been unable to obtain from any source satisfactory information as to the true location of the state line, as it passed through the area in which his lands were situated. Grimes stated that he had made a trip to Washington and had found that the United States Land Commissioner's office had no field notes on the "Tennessee New State Line" shown on the government map and no data "as to who the line was run by or when it was run." Grimes stated that he had talked to the people living or owning lands in that section of the country, "but none of them seemed to know where the line was, haven't any idea." He stated that at one place in Section 14 the line was located 17½ chains north of the section line, "and when you get down into (Section) 16 it is located ten chains south of the section line." Grimes stated that Major T. G. Dabney had run a line in 1894 or 1895 that was located 27 or 27½ chains north of the line shown on the government plat, and that he had run another line several years later and that line was 17 or 18 chains south of the first line.

H. N. Allen testified that his work as a surveyor had been done mainly in the State of Arkansas, and that he had done very little surveying in the State of Tennessee; but he had made a survey of a strip of land lying between Cow Chute and Horn Lake Pass just south of Section 16 at the request of Henry Reichman, and in making that survey it had been necessary for him to locate the state line. Allen stated that he ran the line according to the plat furnished by Mr. Reichman showing the government survey made in 1833. Allen admitted on cross-examination that he knew nothing of the line run by the commissioners in 1837, and if the commissioners' line was 16 chains north of the "Thompson Line," the strip of land that he had surveyed in Section 21 "would mostly be in the State of Mississippi."

It appears from the record in the case that Major T. G. Dabney testified at some stage of the hearing concern-

ing his last survey, which placed the line 94 feet south of the south line of Section 16. But the master in his first report adopted the "Thompson Line" as the true boundary line between the two states. After the filing of the master's report St. John Waddell, who was attorney for the defendants, filed a motion asking that the master's report be set aside and the cause remanded to the master for the hearing of additional testimony, and an order was entered to that effect. The master's second report is not in the record. But a decree was entered on April 2, 1903, awarding damages to the complainant in the sum of $1,821.92, and that decree was affirmed by the State Supreme Court on June 3, 1903.

In the case of James Henderson and Julia Rainey Henderson v. K. R. Armistead and Colonial & United States Mortgage Company, Ltd., the complainants sought injunctive relief against an unlawful detainer action brought by the defendant Armistead "to obtain possession of the land described as the SE½ of Section 16, Township 1, Range 10 West, East of Cow Slough, containing 153 acres." The complainants alleged in their bill that they were in possession of the land under a rent contract with an option to purchase, which had been entered into by Julia Rainey and Sim Rainey with the Colonial & United States Mortgage Company, Ltd., on February 11, 1910. The defendant Armistead in his answer and cross bill alleged that he had purchased the land from the mortgage company in February 1911 subject to the complainants' lease, and that the notes and rent contract had been assigned to him; that the complainants had failed to make the payments provided for in the rent contract; and that he, as owner of the land, was entitled to have the rent contract cancelled. After a hearing upon the merits of the case, the court entered a decree dismissing the complainants' bill and adjudging that the defendant was entitled to the land, and the court directed that a writ of possession be issued.

We think that the chancellor erred in excluding the records of the proceedings of the chancery court in the above mentioned causes. We think that the records were admissible as evidence tending to refute the complainants' claim that the line located 1155 feet north of the south boundary line of Sections 13 to 18, in Township 1, Range 10 West, had been generally recognized as the true boundary line between the States of Tennessee and Mississippi by property owners in the area affected. But, if the evidence had been admitted, it would have had only small probative value, when considered along with the other evidence in the record. No controverted issue was presented as to the true location of the state line in the case of J. A. Anderson, Administrator of W. A. Dooley, deceased, when the court ordered that a survey be made of the lands owned by the decedent on Horn Lake Island, in Township 1, Range 9 West. The surveyors in that case apparently accepted without question the "Thompson Line" as it appeared on the township plat, as the true line between the two states. In the field notes which they used in making the survey no mention is made of tree pointers marked with a "T" or an "M", which were the distinguishing marks of the line run by the commissioners in 1837; and the plat which they filed contained no reference to the state line run by the commissioners. In the case of James Henderson et ux. v. K. R. Armistead et al., no question was raised as to the true location of the state line.

In the Grimes case there was a definitely controverted issue as to the true location of the state line, and the court apparently accepted a line run out by Major Dabney about the year 1900 as the true line for the purpose of computing the amount of damages that Grimes was entitled to recover for the timber which the defendants had cut. But the record in the case that we have here shows that the line run by Major Dabney found little or no support among the surveyors who surveyed lands in the Cow Island area after the Grimes case was decided.

The so-called Dabney line is not shown on any map that has been called to our attention, and the appellant's own witness, R. L. Cooper, testified that the line located 1155 feet north of the south line of Sections 13 to 18, in the Cow Island area, had been recognized as the established boundary line between the two states by surveyors doing work on both sides of the line.

There may have been uncertainty as to the true location of the state line among the widely scattered inhabitants and nonresident landowners of the Horn Lake Island area seventy-five years ago, when Dooley's administrator applied to the court for an order to sell Dooley's lands for the payment of debts, and in the Cow Island area twenty years later, when Grimes sued Mosby and Perryman for the wrongful cutting of timber; but according to the testimony in the record that we have here, there is no room for doubt as to the location of the line that has been recognized and acquiesced in by the people residing in and owning lands in those areas during the last forty years and by the political authorities who levy and collect taxes. The Phillips land lying along the south side of Sections 16 and 17, and the Jarratt land in Section 20, are only a few miles south of the City of Memphis. A U. S. marked highway now passes along the east edge of Horn Lake. Much of the land in the area between the highway and the river is in a high state of cultivation. Time and the timber cutters' axes have destroyed the reference trees which marked the line run out by the commissioners in 1837. But it is not unreasonable to assume that the line which has been recognized by the surveyors who have done work on both sides of the line during the last forty years, and by the political authorities of the two states and the people who have lived along the line for a long period of time, is the line run out and marked by the commissioners.

We repeat, however, what has been said above: The question which the chancellor had to decide upon the

original hearing, and the question that we have to decide on this appeal, so far as the state line is involved, is the question as to where the state line is, not where it ought to be.

The admission of the records of the proceedings of the Chancery Court of Shelby County in the three cases mentioned above would have had no effect upon the final result in these cases; and although we think there was error in the chancellor's refusal to admit the records in evidence, the error complained of was harmless and would not justify a reversal of the decrees appealed from.

■■■ It is next argued on behalf of the appellant that the court erred in not holding that the appellant and his predecessors had acquired title to the south 140 acres of each of the two Sections 16 and 17, Township 1, Range 10 West, by adverse possession. But we think there is no merit in this contention. There is no substantial evidence in the record to support the appellant's claim that either he or the heirs of K. R. Armistead, had been in possession of or had exercised control over the south 140 acres of either of the above mentioned Sections 16 and 17 at any time after P. B. Marshall acquired title to the lands in 1926 and 1930, and prior to May 1953, when the appellant began to graze cattle on the lands.

The proof offered on behalf of the complainants, J. R. Phillips, Jr., and others, showed that the fractional Section 16 was sold to the State of Mississippi in 1862 for taxes assessed against the land for the year 1861, which were due and unpaid, and that the title remained in the state until 1926, when P. B. Marshall obtained a forfeited tax land patent to the land. The fractional Section 16, 100 acres, was assessed to P. B. Marshall on the 1926-1927 assessment roll, and to him and his successors in title thereafter. The proof also showed that the fractional Section 17, 69 acres, was assessed to R. E. L. Morgan as the owner thereof on the 1923-1924 assessment roll, and on the assessment rolls for each of the years

thereafter until 1930, and that the land was sold June 2, 1930, for taxes due and unpaid for 1929, and was struck off to P. B. Marshall. Title matured in Marshall two years later. After his purchase of the lands Marshall paid the taxes on the lands each year, mortgaged the lands and claimed the lands as his own until his death. Marshall died in 1934, and after his death his widow, Mrs. Rebie Marshall, and his daughter, Hazel Marshall, gave a deed of trust on the lands to T. P. Flinn, and sold the lands in 1937 to Dr. H. G. Rudner. Dr. Rudner testified that after he purchased the fractional parts of Sections 16 and 17 from Mrs. Marshall and her daughter, he had the land surveyed, paid off the mortgage indebtedness on the land, and in 1941 sold the timber on the land to the Memphis Veneer Company and received the proceeds of the sales of the timber, which amounted to $766.50. He paid the taxes on the land in DeSoto County each year until he sold the land to Phillips Lumber Company in 1950. Dr. Rudner testified that he received no information from any source during the time that he owned the land that any one else was claiming the land.

Several of the appellant's own witnesses testified that they knew that there was a strip of land between the Armistead land on the north and the Perkins land in Section 20 that belonged to some third person. Some of the witnesses referred to the strip of land as ''the widow's land'', or ''Dr. Rudner's land''; and Ernest Nelson knew where the boundaries of the Dr. Rudner land were located. Ernest testified that, ''The Rudner land starts at the State Line and goes something like 400 steps south.'' The Armistead heirs were assessed with no lands in Sections 16 and 17 in Mississippi and paid no taxes on lands in those sections in Mississippi; and none of the Armistead heirs appeared to testify in support of the appellant's claim that they had acquired title to the Phillips lands by adverse possession.

It is next argued on behalf of the appellant that the court erred in refusing to hold that the complainant Jarratt and Roan Perkins, his predecessor in title, had not been in possession, but the defendant Brown and his predecessors had been in possession, of that part of Section 20 lying north of a line running east and west across the north side of said section, 10 chains south of the north boundary line of said section, and all that part of said section lying west of a ravine alleged to have been pointed out by Roan Perkins to one or more of the defendant's witnesses as the west line of his 140-acre tract.

But there is no merit in this contention for two reasons: (1) That K. R. Armistead, by his warranty deed dated December 18, 1916, conveyed to Roan and Maggie Perkins the land described as ''All of fractional Section 20 in Township 1, Range 10 West, in DeSoto County, Mississpipi,'' reserving no part of said Section to himself; and (2) that there is no substantial evidence in the record to show that K. R. Armistead, during his lifetime, or his heirs after his death, claimed title to, or exercised acts of ownership over the strip of land off the north side of Section 20 mentioned above or the land lying west of the ravine.

■■ ■■ The rule is well settled by the decisions of our own Court that where one enters into possession of land, claiming title by deed, his possession by law will be deemed co-extensive with the boundaries stated in his deed. Hanna v. Renfroe, 32 Miss. 125; Welborn v. Anderson, 37 Miss. 155; Wilson v. Williams' Heirs, 52 Miss. 487. ■■ ■■ Actual possession of part of a tract of land under color of title of the whole is constructive possession of the whole. Native Lumber Co. v. Elmer, 117 Miss. 720, 78 So. 703.

''Where land fronting on a river or other body of water is conveyed by deed, the right to accretion already attached passes to the grantee, although not specially mentioned, unless it is expressly excepted or reserved, or

has previously been conveyed to another.'' 56 Am. Jur., 896, Waters, par. 481; Smith v. Leavenworth, 101 Miss. 238, 57 So. 803; Houston Bros. v. Grant, 112 Miss. 465, 73 So. 284.

It is true that the appellant produced several witnesses who testified that Roan Perkins had made verbal statements to them that an iron pipe on Rocky Chute marked the northeast corner of his land, and that his land extended only to the ravine on the west. But those statements were at variance with the deed under which Roan Perkins had acquired title to the land, and the testimony of the witnesses who testified that Roan had made such statements was at variance with the testimony of the members of Roan Perkins' family who lived on the land with him and the testimony of several other witnesses who, so far as this record shows, had no interest in the controversy, and the chancellor had a right to reject that testimony as being untrue.

The record shows that Roan Perkins purchased the land from K. R. Armistead on December 18, 1916, for the sum of $3,025.20, of which amount the sum of $1,200 was paid in cash and the balance was evidenced by four promissory notes, due January 1, 1918, 1919, 1920 and 1921, respectively, which were secured by a mortgage deed of trust on the land. Armistead conveyed the land to Roan and Maggie Perkins by the same description as that which appeared in the deed executed to him by the Anderson-Tully Company. After his purchase of the land Roan began clearing the land and building houses on the land; and he and his wife and his daughter, Ella Smith, moved on the land in 1919. Several other relatives of Roan and his wife moved on the land soon thereafter. Roan built five houses on the land and cleared and cultivated about 68 acres. He sold timber from the land, built fences, pastured his cattle and work stock on the land, and paid the taxes assessed against the lands each year. Roan granted permission to others to hunt and fish on the

land, and according to the testimony of the complainants' witnesses, including members of the family who resided on the land, Roan claimed and occupied the accretions formed by the river moving westward. Roan died in 1936; and after his death, his widow, Maggie Perkins, and his daughter, Ella Smith, continued to live on the land and exercised all of the rights of ownership over the land. They paid the taxes on the land, sold the timber, cultivated the cleared parts of the land and pastured the remainder. Maggie and Ella moved off the land in 1945. Maggie died in 1946, and after her death the heirs and devisees of Roan and Maggie continued to exercise the rights of ownership over the land and paid the taxes, until they conveyed the land to Jarratt in 1952.

Ella Smith testified that no one except Roan and Maggie claimed any part of the land in Section 20 during the time they lived on the land. Ella stated that Richard Armistead, K. R. Armistead's son, stayed with her and her husband two years after his father's death in 1926, while he was looking after the Armistead land on Cow Island in Tennessee, and that he never claimed any of the land in Mississippi that Roan and Maggie had purchased from his father. Corinne Smith, who was Roan's niece, testified that Roan claimed all the land to the river on the west side, "plum down to the river." Charlie May Battle testified that Roan was her grandfather, and that she lived with Roan and Maggie after 1919, and that Perkins' land on the west side extended to the river—"They always said from Rocky Chute to the river belonged to my grandfather." Charlie Matthews testified that he helped Roan build the first fence that was put there, and that they brought the fence to the river's edge. Ed Nelms testified that he grew up on Cow Island and had known Roan Perkins and Maggie Perkins all his life, and that Roan Perkins owned all the land to the river. Fred Knichel, who was State and Federal Game Warden, testified that he obtained written permission from Mag-

gie Perkins to hunt on the land in Section 20 about 1940, and Maggie stated to him at that time that she owned the land from Rocky Chute to the river. Knichel testified that the state line was located between the Perkins land and the Armistead land, and that he had been told that Dr. Rudner owned a small strip of land in there.

The above testimony in our opinion was sufficient to support the chancellor's finding that Roan Perkins and his wife took possession of all of the land in Section 20 under their deed from K. R. Armistead, and that they occupied the same and claimed it as their own until the time of their deaths, and that their heirs and devisees claimed it after their deaths.

Armistead's deed to Roan and Maggie Perkins conveyed to the grantees therein all the land in Section 20, including the accretions to Section 20 formed along the east bank of the river, as the river gradually receded westward, and there is no substantial evidence in the record to support the appellant's claim that Armistead or his heirs had exercised any acts of ownership or control over the land or asserted any claim to any part of the land after the conveyance of the land to Roan and Maggie Perkins in 1916.

We find no reversible error in the record, and the decrees of the lower court are therefore affirmed.

Affirmed.

*Roberds P. J.,* and *Lee, Arrington* and *Gillespie, JJ.,* concur.