NATIVE LUMBER CO. ET AL. *v.* ELMER.

[78 South 703, Division A.]

1. ADVERSE POSSESSION. *Constructive possession.*
   The actual possession of part of a tract of land under color of title of the whole is constructive possession of the entire tract.

2. LOST INSTRUMENTS. *Evidence. Sufficiency.*
   Under the facts in this case, which was a suit to determine the ownership of land and to remove clouds on title, wherein respondent claimed through a lost deed from the common source of title, the court held that the evidence was sufficient to show the execution and delivery of such lost deed.

3. ADVERSE POSSESSION. *Evidence sufficiency.*
   Payment of taxes on land for twenty-four successive years by the party in possession is powerful evidence of the claim of right to the whole lot upon which the taxes were paid, and it is some evidence that the possesion was under a claim of right and was. adverse.

4. SAME.

In this case the court held that the evidence as set out in its opinion was sufficient to show adverse possession by respondents under color of title for over ten years.

APPEAL from the chancery court of Harrison county. HON. W. M. DENNY, JR., Chancellor.

Suit by F. W. Elmer and others against Native Lumber Company and others. From a decree for complainants, respondents appeal.

The facts are fully stated in the opinion of the court.

*White & Ford* for appellants.

The principles of law dealing with acquisition of title to real estate by adverse possession are well established and generally recognized. There must be actual adverse possession for the statutory period of ten years, under a claim of right, either by occupancy of the entire tract, or, by occupancy of a part under color of title, to the whole tract. Actual residence upon the land is not required, but if that test were applied to this case, the proof does not fail to supply the requirement. It cannot be doubted that Richard Deveraux and at least four families of relatives settled upon that part of the land lying east of Ichouticabouffa River, establishing houses there, and actually living upon the land until 1873. During this time Richard Deveraux claimed the entire tract under an unrecorded deed from Jacob Elmer. The authorities in Mississippi hold uniformly that even a parol contract of sale for real estate will afford color of title against the vendor or those claiming under him, for example, his heirs, as in this case. The latest announcement of the rule is contained in this case of, *Brooks Scanlon Lumber Co.* v. *Childs,* 113 Miss. p. 246, at page 253 of the opinion rendered by Justice SYKES.

The court said: "In this state this court has recognized parol color of title of a vendee as against

117 Miss.—46.

his vendor and those claiming under him. When a vendor puts his vendee in possession of the land under a parol sale, he knows the limit and the claim of the vendee to this land. As to him it is unnecessary that there should be a visible actual occupation of the entire tract, because of his actual knowledge of the claim of ownership.'' *A fortiori,* the vendor would know the extent of the claim, in case of an unrecorded deed.

The principle announced in this decision has several times been applied in Mississippi, as shown by the following cases: *Niles* v. *Davis,* 60 Miss. p. 750; *Davis* v. *Davis,* 68 Miss. p. 478; *Magee* v. *Magee,* 37 Miss. p. 138.

It is well established that an unrecorded deed gives color of title to possession thereunder. This principle is generally recognized. See *Lee* v. *Polk County Cooper Co.,* 62 U. S. Sup. Ct. 493; *Winston* v. *Prevost,* 6 L. Ed. 164; *Minot* v. *Brooks,* 16 N. H. 374; *Ring* v. *Gray,* 45, Ky. p. 638; *New Market Mfg. Co.* v. *Pendergast,* 24 N. H. p. 54. See case of *Crowder* v. *Neal,* 100 Miss. 730.

This case holds squarely that the fact of another owning land within the enclosure will not prevent the occupancy from being adverse and the statute of limitation from running. See also case of *Moran* v. *Moseley,* 164 S. W. 1093, holding: ''It is not necessary to title by adverse possession that the land be separately enclosed, but it is sufficient if it is within a general enclosure.

The leading case of *Caruth* v. *Gillespie,* 109 Miss. p. 679, far weaker in its facts that this, strongly supports our contention here. The authorities might be multiplied on this question, but we deem the foregoing sufficient.

The next question arising from the facts shown by the record is whether or not a conveyance of these lands from Jacob Elmer to Richard Deveraux is shown. On

this point. there is not the slightest controversy, in proof as to what actually happened. The only matter to be discussed is whether the proof was sufficient to established the deed.

On the assessment roll of 1886, appears a notation that the land was purchased from Jacob Elmer by Richard Deveraux, and the assessment was changed for that year from Elmer to Deveraux. For fifty-one years after the trade with Deveraux, the taxes were paid by Deveraux and his successors in title, and it was not until a meddling abstractor, more than a half century afterwards, discovered by accident and called to appellee's attention the break in the title, that we hear of any claim made to the land by Elmer, or his decendants.

The next proposition involved in this record is whether the law will presume a grant from Elmer to Deveraux under the facts shown by the proof. Of course this question is closely allied to that of adverse possession, and it might with propriety have been considered along with that phase of the case, but we prefer to treat it separately.

We shall not burden the court with a multitude of authority, but shall cite a few selected cases. *Hewling* v. *Blake,* 110 Miss. p. 225; *Caruth* v. *Gillespie,* 109 Miss. p. 679; *Nixon's Heirs* v. *Carco's Heirs,* 28 Miss. 414; *Stephenson's Heirs* v. *McReary,* 12 S. &. M. 9; *United States* v. *Chaves,* 44 L. Ed. 255. The will of Jacob Elmer (shown at page 30 of this transcript), shows a complete adandonment of claim to any lands in Harrison County outside the city of Biloxi. The testator says: "I give, devise and bequeath all the estate, real and personal, which it has pleased God to bless me with as follows to wit:"

In conclusion we submit that the title of appellants to the land had become complete by adverse possession long before the suit was filed. In the case of

*Geogehan* v. *Marshall,* 66 Miss. 676, the court held that it is not necessary for the adverse possession to continue during the whole time from the beginning of the claim to the date of suit, but it is sufficient if there be ten years continuous adverse occupancy at any period before suit is filed.

We submit confidently that the proof shows that a deed was executed by Jacob Elmer to Deveraux, and certainly the law will presume a grant in the presence of proof so strong and convincing.

*W. E. Morse* and *J. M. Morse,* for appellee.

To constitute adverse possession there must be open exclusive, hostile, and notorious possession as against the whole world. If the facts do not bring the case within this rule then it is not adverse possession.

We will, therefore, take up the different acts relied upon and study them more in detail to see whether or not they constitute adverse possession.

The Deveraux family took this land under a claim of right. They were in truth and in fact mere trespassers; they did not even take under color of title; therefore if any action of theirs was sufficient to constitute adverse possession, then it would only attach to that particular part of the land which they had in their immediate possession.

Our state court has held: "One entering land without color of title is limited to possessio pendis." *Niles* v. *Davis,* 60 Miss. 755; *Ryan* v. *M. V. Ry.,* 62 Miss. 162; *Chastang* v. *Chastang,* 37 So. 799; 10 R. C. L. Adverse Possession, sec. 42, says: "It has been established by the great weight of authority that the rights of those who enter upon the land as mere trespassers, that is, without color of title, will be confined to that portion of the property which was subject to their actual possession."

But says the appellants, that the Devereaux family burned charcoal over most of the land, and cut down a great deal of the timber upon the same. We still say that they would be limited to the particular portion that they lived upon. But say that it did not; say that their claim extended to the entire tract of four hundred acres. Even then, the acts of the Devereaux would not be sufficient to constitute adverse possession, for the proposition that the cutting of timber and other slight acts of trespass will not support the contention of adverse possession. See *Stevens Lbr. Co.* v. *Hughes,* 38 So. 769; See, also, *Leavenworth* v. *Reeves,* 64 So. 660, 2 C. J. p. 64.

Yet granting every contention made by appellants as to the acts of the Devereaux family, that they held adverse to Elmer; that they held the entire four hundred acres on account of having burnt charcoal over some of it and having cut some timber from the land, still the time which they held the property was only for seven years, and if there was to be any adverse possession it had to arrive under the holding of Krohn, because there was an abandonment of their claim when they moved off the property, for the reason that they had no color of title, they were holding as mere trespassers. moved off the property. For the reason that they had no See *Harper* v. *Tapley,* 35 Miss. 506.

The only other claim advanced by the appellants was that they paid taxes, they seemed to put a great deal of stress upon this point. This is a good question upon which to cite authorities for in our case, but the following are only a few of the cases upon this subject. *Kennedy* v. *Saunders.* 90 Miss. 542; *Leavenworth* v. *Reeves,* 64 So. 660; 19 R. C. L. On the subject of adverse possession, par 12: In proving a claim of title by adverse possession it is competent to introduce evidence showing the payment of taxes by the claimant on the property involved for all, or a part of the time, it was in his possession. Such evidence is to be con-

sidered by the jury in connection with other in the case, but is not of itself sufficient to establish adverse possession.''

For other cases covering this identical point see: *Ewing* v. *Burnett,* Fed. Cas. 1; *McLean* 266; *Brown* v. *Bacquenne,* 57 Ark. 89, 20 S. W. 813; *Ballenger* v. *Cauteau,* 20 Mo. 89; *Cashman* v. *Cashman,* 50 Mo. App. 663; *Molley* v. *Bruders,* 86 N. C. 251; *Reed* v. *Field,* 15 S. W. 672; *McCaughn* v. *Young,* 85 Miss. 287.

Taking all of the acts of adverse possession relied upon by the appellants and we have an insufficient possession to constitute adverse possession as required by the law in our state. *Kennedy* v. *Saunders,* 90 Miss. 543; *Cohn* v. *Smith,* 94 Miss. 519. Appellees show an unbroken chain of tax receipts for thirty-seven years; having paid the taxes on the land every year since 1872.

The land is not susceptible of actual occupancy and cultivation. It is shown that the father of two of the appellees claimed the land in his lifetime, that he had it posted to keep off the trespassers; used the timber on it, such as he needed for fencing and firewood. In other words, he exercised such acts of possession and control of the land as he exercised over any other land claimed and owned by him.

He not only paid the taxes on the land but gave mortgages or deeds of trust on it just as he would any other property owned by him.

The appellee contends that the deed which Smith received from the state gave color of title to the land in controversy.

Judge Sidney Smith delivered the opinion: ''The evidence of the court below discloses a perfect record title in the appellant to the land in controversy; but the chancellor held that the appellees were the owners thereof by adverse possession. There was evidence of claim of ownership on the part of the appellant, but no evidence amounting to proof of possession. At most it showed nothing more than a mere 'scrambling

possession,' which is not sufficient to cause title to vest
by adverse possession. The decree of the court is
therefore reversed and the bill dismissed.'' For other
Mississippi cases on this, see *McGehee* v. *McGehee,* 37
Miss. 151; *Huntington* v. *Allen,* 44 Miss. 668; *Stephens
Lbr. Co.* v. *Hughes,* 38 So. 769; *Leavensworth* v. *Reeves,*
64 So. 660; *Dedeaux* v. *Delisle Lbr. Co.,* 73 So. 53.

It is manifestly unnecessary to cite authorities from
other states when our courts have so thoroughly gone
into this subject and have rightfully decided the princi-
ple.

The cases cited by appellants, *Hewling* v. *Blake,* 110
Miss. 225; *Caruth* v. *Gillespie,* 109 Miss. 679, in support
of a presumption of a lost deed do not apply, for in
these cases the successful parties had been in the ac-
tual possession of the land for longer than ten years
under color of title and the only reason the cases were
in court was that the state was interested in the title
of the land, or had shortly owned the title which stopped
the statute of limitation from running.

We think that the decision of the lower court was
eminently proper, both on the law and upon the facts.

SYKES, J., delivered the opinion of the court.

The appellees, complainants in the lower court, filed
a bill against the appellants, praying that they be de-
clared owners of certain lands in Harrison county and
that the claim of the appellants to this land be canceled.
Answer was duly filed and the case was tried before
the chancellor on bill, answer, and proof, and a decree
was rendered in favor of the complainants (appellees
here); from which decree this appeal is prosecuted.

There are very few contradictions in the testimony
in the case. In fact, there are no contradictions of the
material facts in the case which we shall state. Both
appellants and appellees deraign title to the land in
controversy from a common source, namely, one Jacob

Elmer, who seems to have procured title to the land in or about the year 1858. The land in controversy in this suit and the companion case of *L. N. Dantzler Lumber Co. et al.* v. *These Appellees* (No. 20194) 78 So. 706, contains ten forty-acre tracts, or four hundred acres.

Jacob Elmer, the ancestor of appellees, resided in the city of Biloxi, and during the latter part of the Civil War he built upon the land in controversy a four-room log house and resided there for a period of less than one year, after which he moved back to Biloxi. It is the contention of appellants that this four hundred-acre tract of land was sold by Jacob Elmer to one William Devereaux in the year 1866, and a deed executed by Elmer to Devereaux to the land in question, and that William Devereaux and his family after the execution of this deed moved upon the land before Christmas in 1866, and he and his successors in title have owned and occupied the land continuously up to the filing of this suit, namely, August, 1913. William Devereaux, in 1873, by deed duly recorded, sold the land to one John Krohn. Krohn owned the land for about twenty years, and whatever title he had passed to the appellants. The only break in the title of the appellants is the alleged lost deed from Jacob Elmer to William Devereaux. When Jacob Elmer moved back to Biloxi he left living in the log house on the land a white man by the name of John Hudson, who was then about seventeen or eighteen years old. With Hudson lived his widowed mother and an old man named Williams. The testimony relating to the purchase of these lands by William Devereaux is that Devereaux consulted with his grown sons and sons-in-law, about four in number, as to the advisability of buying the land; that it was agreed among them for him to do so, and that they would help in paying for the same. Devereaux then went to Biloxi and made the trade with Elmer, agreeing to pay three hundred dollars down and

three hundred within a year. This fact he reported to the family, and the sons and sons-in-law turned over to William Devereaux sufficient money to make the cash Payment. Devereaux then returned to Biloxi and came back and reported the purchase of the land.

At the time of the trial of the case Jacob Elmer and William Devereaux were both dead. Sons and sons-in-law of Devereaux testified in the case. One of them testified that when William Devereaux returned from Biloxi he showed him a paper which he said was a deed to the land, but witness did not read it and did not know its contents except what he was told by William Devereaux. The other witness, a son of William Devereaux, testified that he could read and write and he usually examined papers for his father; that his father gave him this deed and he examined it; that it was signed by Jacob Elmer and was a deed to the land. He stated that he did not know the description of the land as contained in the deed, and that he was under the impression, as were his other relatives who testified, that his father purchased six hundred and one acres from Elmer. This deed was lost. Shortly after the alleged purchase, and before Christmas in 1866, a part of the family moved upon the land and temporarily lived in the four-room log cabin built by Jacob Elmer. When they first moved out they found John Hudson in possession. Hudson testified that he was told of the purchase of the land from Elmer, but demanded a written showing from them to that effect before surrendering possession; that shortly thereafter they brought a note from Jacob Elmer, the contents of which was that he had sold the land to William Devereaux and to turn possession over to him. William Devereaux had quite a large family. He himself lived in the four-room log cabin, and four other houses were immediately erected on the land by two sons and two sons-in-law up and down a creek running diagonally through the land; this settlement extending for about

a mile, and being upon the land purchased from Elmer. Small patches of land were cultivated about the houses, some inclosures were made around them, and the land was generally burned for coal during the period that the Devereaux family lived there. Some timber was also sold off of the land by the Devereaux, and some of the testimony shows that Jacob Elmer actually bought some of this timber from the Devereaux. Most of this family resided there until they sold the land by deed to John Krohn in 1873. The Devereaux then moved away. After his purchase of the land John Krohn allowed his brother-in-law, John Seymore, to live on the land for a year or two, and also allowed two negroes to live there for probably a year after Seymore. The testimony is not very positive as to the length of time these parties lived on the land. The testimony further shows that John Krohn tore down some of the houses and used the lumber for building purposes on his own land; that he burned charcoal and cut timber on the land and sold some of the timber to different parties. John Krohn claimed to be the owner of the land and was recognized generally as such. In fact, the record shows that no one has made any claim adverse to that of the appellants from 1866 until the filing of these bills; that during all of this time the lands have been assessed and taxes paid by the appellants and their predecessors in title.

In 1883 John Krohn and his son built a fence extending from one creek to another, which, together with the creeks, inclosed about one-third of the land here in controversy. There were other lands also in this inclosure. This inclosure was used for a sheep pasture for a number of years. The testimony of appellants is that the fence stood there for about ten years; that of the appellees is that it remained there only five or six years; so we accept the statement of appellees' witnesses that the fence only remained there for about five or six years. It was then burned up. An exami-

nation of the land generally showed that all of the timber had been cut off it about fifteen or twenty years before the filing of the suit; that a great deal of the timber had been turpentined; that a few years before the filing of the suit one of the defendants had built upon the land a broom house, which was used by it in rafting its timber down the creek. Jacob Elmer, during his lifetime, is shown to have owned land in both Harrison and Jackson counties. At the time of his death in 1894 he owned lands in Jackson county and real estate in the city of Biloxi. His will was made during that year. A part of this will reads as follows:

"I give, devise, and bequeath all the estate real and personal which it has pleased God to bless me with as follows, to wit:

"Item 1. I give, devise and bequeath all the personal property and choses in action, which I may die seized and possessed, also all the real estate I may own at my death situated, lying and being within the incorporated limits of the city of Biloxi in the county of Harrison, state of Mississippi, to the following named of beloved children, to wit: [Naming them], to them in fee simple forever, share and share alike; I hereby nominate and appoint my beloved daughter, Effie Elmer Dulin, executrix of this part of my will and of her I require no bond or security."

Item 2 then devises all of his real estate in Jackson county to his children by first marriage, naming them. Item 1 appoints one of his children as executrix of that part of his will, and item 2 appoints one of the beneficiaries under that item as executor of that part of his will. Item 3 provides for the payment of funeral expenses.

In 1904 the Native Lumber Company, the appellant in this case, filed a bill in the chancery court of Harrison county against the children mentioned in item 1 of the will of Jacob Elmer to cancel the claim of these children to these lands as a cloud upon the title of complainant.

A *pro confesso* and final decree was entered in favor of complainant. Consequently in this case the chancellor held that the children of Jacob Elmer who were not parties to the suit above mentioned owned an undivided six-eleventh interest in this land. It is also well to state that the appellees in this case themselves were not informed of the defect in the appellants' title until told by an abstractor of the county. Their claim here is based merely upon the bare legal title.

The uncontradicted facts in this case show that in 1866 William Devereaux and his family entered into the actual possession of this land under a written claim signed by Jacob Elmer. Whether this paper was a valid deed or not the testimony does not show. What land was described in it is not shown. The testimony, however, shows that all of the land in controversy in these two cases was claimed by William Devereaux under this paper. The paper has been lost. Consequently, William Devereaux and his family entered into possession of the land under color of title in 1866. The actual possession of part of this land under color of title of the whole was a constructive possession of the entire four hundred acres. *Jones* v. *Gaddis,* 67 Miss. 769, 7 So. 489; *Mitchell* v. *Bond,* 84 Miss. 72, 36 So. 148. In this case, however, the testimony abundantly shows that William Devereaux was actually in the possession of the entire four hundred acres of land. In fact, his ownership and possession of this land was of the highest character of which the land was then capable. The note from Jacob Elmer to John Hudson was an admission by Elmer that he had parted with his title to the land and sold it to William Devereaux. After that time there is no claim whatever by Elmer in any way that he owned the land. Jacob Elmer lived twenty-eight years after William Devereaux took actual possession of the land, and during all that period of time in no way did he make any claim to the land. The land was assessed to, and the taxes paid

by, Devereaux and his direct and remote grantees. It is clear that Jacob Elmer in his will meant to devise all of the real property of which he was seized, and the fact that this property is not referred to is a strong circumstance going to show that he had parted with his title thereto. From the note written by Jacob Elmer to John Hudson it is perfectly clear that Elmer had actual knowledge of the possession of William Devereaux under color of title during twenty-eight years of his life. Under the facts in this case, the language used in the opinion of the court in the case of *McCaughn* v. *Young*, 85 Miss. 293, 37 So. 839, is applicable:

"Discussing the question of the payment of taxes as evidence of adverse possession, the supreme court of the United States says: 'Payment of taxes, as described in the above statement of facts, is very important and strong evidence of a claim of title; and the failure of the plaintiff's predecessors to make any claim to the lot, or to pay the taxes themselves, is some evidence of an abandonment of any right in or claim to the property. In *Ewing* v. *Burnet*, 36 U. S. (11 Pet.) 41 (9 L. Ed. 624), it was held by this court that the payment of taxes on land for twenty-four successive years by the party in possession was powerful evidence of the claim of right to the whole lot upon which the taxes were paid. The same principle is held in *Fletcher* v. *Fuller*, 120 U. S. 534, 552 (7 Sup. Ct. 667, 676, 30 L. Ed. 759, 764). It is some evidence that the possession was under a claim of right and was adverse.' *Holtzman* v. *Douglas* [168 U. S. 278], 18 Sup. Ct. 65 (42 L. Ed. 466.)"

In this case it is to be borne in mind that there was an actual disseisin of Jacob Elmer in 1866 of which he had actual knowledge, or that he had actually sold the land to William Devereaux and rightfully placed him in possession of same. In discussing possession under similar facts, we against quote from *McCaughn* v. *Young, supra*:

"The underlying principle on which is founded the rule requiring that possession must be open and notorious before it can be considered adverse to the real owner is that such character of possession is presumptive notice to the true owner of such possession and adverse claim. But the rule does not apply in cases where the party against whom the adverse claim is asserted has actual knowledge of such adverse possession. A possession which is adverse and actually known to the true owner is equivalent to a possession which is open and notorious and adverse. *Dausch* v. *Crane,* 109 Mo. 336 (19 S. W. 61); *Clark* v. *Gilbert,* 39 Conn. 94; *Alexander* v. *Polk,* 39 Miss. 737; *Ford* v. *Wilson,* 35 Miss. 490, 72 Am. Dec. 137, *supra.* The doctrine is concisely stated in this form: 'If the owner has actual knowledge that the possession is adverse to his title, the occupancy need not be open, visible, and notorious. Notoriety is important only where the adverse character of the possession is to be brought home to the owner by a presumption.' See 1 Cyc. p. 999, par. c, and cases cited."

Had Jacob Elmer during his lifetime attempted to assert title to this land, he would have been estopped to do so because of the note he had written to John Hudson, and those claiming under him in this case occupy no better attitude than he would if living and asserting this claim. The case of *Nixon's Heirs* v. *Carco's Heirs,* 28 Miss. 414, in some respects is similar to this case. We quote from page 430 of 28 Miss.:

"When Nixon was about to purchase the property, what were the circumstances connected with it? He saw that it had been in the peaceable possession of those under whom he was to derive title for upwards of twenty years, by virtue of an instrument of writing executed by Carco, which, though not formal deed of conveyance, was yet evidence that he had sold the land, and was a sufficient writing to conclude him from setting up title against it. Carco had been dead nearly

twenty years, and his heirs had set up no claim what-
ever to the property, though living near it, and aware
that Krohn had purchased it and expended a large
sum of money in improving it; and some of the heirs
had actually acquiesced in his title. Under such circum-
stances, was Nixon not justified in purchasing the prop-
erty, and will the heirs of Carco be permitted to de-
prive him of the property by force of technical im-
perfections in his title? It cannot be a matter of doubt
what the rule of equity is in such a case. It is clearly
laid down by Chancellor KENT in *Wendell* v. *Van Rens-
selaer,* 1 Johns. Ch. [N. Y.] 353, to be, 'that if one
man knowingly, though he does it passively, by look-
ing on, suffers another to purchase and expend money
on land, under an erroneous opinion of title, without
making known his claim, he shall not afterwards be per-
mitted to exercise his legal right against such person.
It would be an act of fraud and injustice, and his con-
science is bound by the equitable estoppel.' And this
doctrine has been sanctioned by this court in [*Dickson*
v. *Green*], 24 Miss. 618, and by universal adoption.
And it is applied with more stringency when the
acquiescence has been so long as to be fortified by the
legal presumptions arising from great lapse of time.
In *Grand Gulf Railroad, etc.,* v. *Bryan,* 8 Smedes &
M. 279, this court says: 'The authorities adundantly
prove that, in favor of long possession, almost every
variety of written evidence of title will be presumed.
The defective links in the chain of title will be supplied
by presumption, and the title declared perfect, when
the possession has continued for a great length of time
without interruption.' S. P. in *Stephenson's Heirs* v.
*McCreary,* 12 Id. 47 [51 Am. Dec. 102] *et seq.,* and
authorities there cited.''

From all of the circumstances in this case, the pre-
sumption that there was a deed from Jacob Elmer to
William Devereaux was raised, and the chancellor as
a matter of law should have so found. *Caruth* v. *Gil-*

*lespie et al.,* 109 Miss. 679, 68 So. 927; *Heuling* v. *Blake et al.,* 110 Miss. 225, 70 So. 247; *Nixon's Heirs* v. *Carco's Heirs, supra.*

Adverse possession under color of title for a period of over ten years was also established.

The decree of the lower court is reversed, and the bill dismissed.

*Reversed and dismissed.*