# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-CA-01547-COA

**DAVID M. COX, PAUL D. EAVENSON AND GULF FORESTRY
ASSOCIATES, INC.**                                                      **APPELLANTS**

**v.**

**F-S PRESTRESS, INC.**                                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/1997 |
| TRIAL JUDGE: | HON. JOHNNIE WILLIAMS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WILLIAM H. JONES |
| ATTORNEY FOR APPELLEE: | ROBIN L. ROBERTS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| TRIAL COURT DISPOSITION: | TITLE TO REAL ESTATE QUIETED IN APPELLEE |
| DISPOSITION: | AFFIRMED - 7/20/99 |
| MOTION FOR REHEARING FILED: | 8-16-99-DENIED-3/14/00 |
| CERTIORARI FILED: | 3/24/2000; granted 6/1/2000 |
| MANDATE ISSUED: | |

ON MOTION FOR REHEARING

ENBANC:

KING, P.J., FOR THE COURT:

¶1. This case came as an appeal from the judgment of the Forrest County Chancery Court which found that F-S Prestress, Inc. should recover $27,118.52 from David M. Cox and Paul D. Eavenson for the cutting of timber from F-S Prestress's land in violation of Miss. Code Ann. § 95-5-10(1) (Rev. 1994). The parties are adjoining property owners and both sides claimed ownership of the tract of land from which the timber was removed.

¶2. On appeal, the appellants raise the following issues:

**(1) BOUNDARY LINES DEFINED BY THE BOUIE RIVER REMAINED CONSTANT AMONG CONTIGUOUS PROPERTY OWNERS EVEN AFTER THE BOUIE RIVER MADE A CHANGE OF COURSE BECAUSE THE CHANGE WAS AVULSIVE AND NOT THE RESULT OF ACCRETION.**

**(2) COX AND EAVENSON ALSO OWN THE ISLAND PROPERTY TO THE EAST OF THE OLD CHANNEL BY ADVERSE POSSESSION AND UNDER COLOR OF TITLE.**

**(3) THE FAIR MARKET VALUE OF THE TIMBER REMOVED FROM THE ISLAND PROPERTY WAS $3800 BEING THE AMOUNT RECEIVED BY THE SELLER.**

¶3. We find no basis for the reversal of the chancery court judgment and affirm that judgment.

## FACTS

¶4. This case involves a dispute between two adjoining property owners concerning approximately seventeen acres of land, located on the Bouie River (also referred to as the Bowie River) in Forrest County. The dispute exists because of the changes in the course of the river, which acted as the boundary to the lands of the parties on the east and west of the river. Originally, there was a meander in the river creating a peninsula of land lying to the east of the river. It is undisputed that the river changed its course, leaving the peninsula as an island, which lies west of the new channel of the Bouie River.

¶5. Wiley Fairchild and James W. Snowden, Jr. purchased land from W. A. Steele and wife, Corine S. Steele, on April 18, 1957, and then transferred the property to their company, F-S Prestress, Inc., on May 3, 1957. The property was described, in part, as

> That part of the W ½ of NE 1/4 lying and being West of Bouie River, and that part of the E ½ of the NW 1/4 lying and being West of Bouie River, and that part of the NW 1/4 of SE 1/4 lying and being West of Bouie River, and NE 1/4 of SW 1/4 and a parcel of land on the S ½ of SW 1/4 of SW 1/4 . . . .

¶6. David M. Cox and Paul Eavenson purchased the adjoining property east of the Bouie River on January 17, 1989, from First Guaranty Bank for Savings, which had foreclosed on a deed of trust to Associated Land Developers, Inc. The predecessors in interest to Associated Land Developers were C. A. Clinton, Jr., and wife, Valcoe Clinton. The property owned by the Clintons in Section 14 was described as

> Commence at the Northeast Corner of the Northeast Quarter of Section 14, Township 5 North, Range 14 West, Forrest County, Mississippi, and run West 853.7 feet, thence run Southeast along the West line of Illinois Central Railroad right-of-way 300 feet to and for the point of beginning; thence run South 55 degrees 40 minutes West a distance of 376 feet, thence run South 36 degrees East a distance of 494 feet, thence run South 71 degrees, 30 minutes West to Bouie River, then run Southeast along the Northeast side of said river to the West line of said railroad right-of-way, thence run Northwest along said railroad right-of-way to the point of beginning . . . .

¶7. On December 31, 1992, Cox and Eavenson gave Gulf Forestry Associates, Inc., Daniel K. McGee, a warranty timber deed to

> All that area considered an island bordered by Bowie River on the north and east sides and the old river bed of the Bowie River located in the North half of Southeast quarter, Section 14, T5N, R14W, Forrest County, Mississippi.

> Gulf Forestry paid Cox and Eavenson approximately $2,832.33 for the timber removed. Another timber company paid them $605.42 and $338.08.

¶8. The chancery court entered judgment for F-S Prestress, granting it quiet title to the disputed property and entered judgment in the amount of $27,118.52.

## DISCUSSION

¶9. The first issue is whether the change in the river was through avulsion, which would not affect title, or accretion. The chancery court awarded the property to the landowners west of the river on a theory of accretion.

¶10. The law in Mississippi is well settled that changes in a stream or river that occur gradually over time which change the boundary of the property is referred to as accretion. An avulsive or sudden change in the course of a river causes the property lines to stay the same. *Robinson v. Humble Oil & Refining Co.*, 176 So. 2d 307, 316-17 (Miss. 1965). In *Sharp v. Learned*, 14 So.2d 218, 220 (Miss. 1943), the court explained

> Accretion or alluvion is an addition to riparian land made by the water to which the land is contiguous, so gradually and imperceptibly that, though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on . . . . Avulsion is a change in a boundary stream so rapidly or so suddenly made, or in such a short time, that the change is distinctly perceptible or measurably visible at the time of its progress.

¶11. Dr. Don Williams, associate professor of geography at the University of Mississippi, testified that the process of the change in the course of the Bouie River was the result of a long process of erosion and accretion. A series of aerial photographs from 1942 and 1952 and a topographical map from 1965 showed that the change in the river was gradual.

¶12. Mrs. Addie Clinton Holliman, whose husband and son were predecessors in interest to Cox and Eavenson, testified that water began to flow over the new channel yearly in the early 1960's and that the process of the new channel forming occurred over a long period of time.

¶13. This Court "will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Broadhead v. Bonita Lakes Mall, Ltd. Partnership*, 702 So. 2d 92, 96 (Miss. 1997). While errors of law may be reviewed *de novo*, the standard of review for factual determinations is the substantial evidence standard. *Id.*

¶14. We find that the findings of the court were supported by the evidence and reject the appellant's argument to the contrary.

## II.

¶15. The appellants next argue that they are the owners of the property by adverse possession. The chancery court stated "[b]ecause the Plaintiff has shown that it owns the property in dispute by a gradual change in the course of the Bouie River, there is no need to examine the Plaintiff's adverse possession claim." The court also did not address the appellants/defendants' claim of ownership by adverse possession.

¶16. Miss. Code Ann. § 15-1-13 (Rev. 1995) provides that "[t]en (10) years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10)

years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title." The adverse possessor must show that "possession of the disputed property was (1) open, notorious and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; (6) continuous; and (7) uninterrupted."*Rawls v. Parker*, 602 So. 2d 1164, 1168 (Miss. 1992).

¶17. The appellants do not make a compelling argument that the court should have addressed their claim of adverse possession. Their argument is based primarily under claim of ownership through their predecessors in title. In 1946, the Clinton family took title to the 105 acres east of the Bouie River. In 1951, Mr. Clinton sold timber on the property described as the island cutoff by the Bouie River. The burden of proof was upon the appellants to establish by competent evidence the particular area claimed by them. *Page v. O'Neal*, 42 So. 2d 391 (Miss. 1949). Appellants do not point to any specific acts by them or their predecessors in title which would satisfy the requirements for adverse possession of the disputed property after the change in the Bouie River's channel.

¶18. The testimony at trial was that the Forrest County Tax Assessor's Office had assessed the disputed property to F-S Prestress, Inc. and that they had consistently paid the taxes. While the payment of taxes alone may not be reason to find adverse possession, the payment of taxes has been found to be a persuasive point to consider in finding ownership by adverse possession. *Native Lumber Co. v. Elmer*, 117 Miss. 720, 723, 78 So. 703, 705 (Miss. 1918). "Discussing the question of the payment of taxes as evidence of adverse possession, the Supreme Court of the United States says: 'Payment of taxes, as described in the above statement of facts, is very important and strong evidence of claim of title; and the failure of the plaintiff's predecessors to make any claim to the lot, or to pay the taxes themselves, is some evidence of an abandonment of any right in or claim to the property.' In *Ewing v. Burnet,* 36 U.S. 41, it was held by this court that payment of taxes on land for 24 successive years by the party in possession was powerful evidence of the claim of right to the whole lot upon which the taxes were paid." *Native Lumber Co.*, 78 So. 705, (quoting *McCaughn v. Young*, 85 Miss. 293, 37 So. 839 (1905)).

¶19. We find that the chancery court did not err in failing to consider the appellants' claim of adverse possession.

### III.

¶20. The appellants argue that the court should have based the damage award solely on the amount they received for the timber. The testimony was that the appellants were paid approximately $3776 for the timber. Gulf Forestry paid $2832.33 and another company, Southgate, paid $605.42 and $338.08.

¶21. Miss. Code Ann. § 95-5-10(1) provides:

> If any person shall cut down, deaden, destroy or take away any tree without the consent of the owner of such tree, such person shall pay to the owner of such tree a sum equal to double the fair market value of the tree cut down, deadened, destroyed or taken away, together with the reasonable cost of reforestation, which cost shall not exceed Two Hundred Fifty Dollars ($250.00) per acre.

¶22. The court found that the "fair market value of the trees harvested on the disputed property is the value of the trees as they stand in the woods." The court based its findings on the testimony of Kip McGee, vice president of Gulf Forestry Associates, who stated that "fair market value would be what timber sells for

while it's standing in the woods."

¶22. Mr. McGee was asked to calculate the market value of the timber that was sold off the property. In his calculations he included the amount received from the mill, the amount paid to the loggers, and the amount paid to the appellants. To the figure of $9,128.38, he added $2,730.88 as his calculation of the value of the timber harvested by Southgate. The figure of $11,859.26 arrived at by Mr. McGee was used by the court in calculating the award of damages. The court awarded $23,718.52 in damages or double the amount testified to by Mr. McGee.

¶23. The appellants state in their brief: "The lower court [found] that the fair market value of the trees harvested was the value of the trees as they stood in the woods, or $11,859.26. This may be the actual value of the trees, or the amount the logger must sell the timber for to make a profit, but it is not the fair market value paid to the owner." The appellants do not offer any authority that the price paid to the owner is the "fair market value" contemplated by the statute.

¶24. In reaching its conclusion as to the fair market value of timber, the chancery court had to rely on the testimony or evidence presented. The substantial evidence, as presented through the testimony of Mr. McGee, supports the finding of the court. Consequently, this Court affirms the decision of the court.

**¶25. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS AFFIRMED. COSTS OF APPEAL ARE ASSESSED TO THE APPELLANTS. STATUTORY PENALTIES AND INTEREST ARE AWARDED.**

**DIAZ, PAYNE, AND THOMAS, JJ., CONCUR. SOUTHWICK, P.J., DISSENTING TO DENIAL OF MOTION FOR REHEARING , JOINED BY MCMILLIN, C.J., IRVING AND LEE, JJ. BRIDGES AND MOORE. JJ., NOT PARTICIPATING**

SOUTHWICK, P.J., DISSENTING TO DENIAL OF MOTION FOR REHEARING

¶26. This appeal requires that we adjudicate the effect on real property boundaries of a change in a river's course. With respect for the majority, I find that the principles regarding accretions have been applied to a circumstance to which they do not actually apply. On rehearing the appellant has brought those facts clearly into view. I would grant the motion for rehearing, set aside our prior resolution of the appeal, and reverse the chancellor.

¶27. I note that the issue of adverse possession was not reached by the chancellor. There was evidence of adverse use of the disputed island of land since the river boundary changed about fifty years ago. That may well alter the outcome that arises solely from the doctrines of accretion and avulsion. I would remand to the trial court for further proceedings regarding possession.

¶28. This section of the Bowie River in Forrest County made an ox bow, basically in this shape: U. Until the 1940's this part of the river ran generally easterly, then took a sharp bend to the southwest to begin a circular path before resuming its easterly flow. In the middle of that circle and joined to the land to the north of the river was the tract that is here in dispute. For years the process was ongoing of a new channel being formed across the top of the U. At some point in time the river broke through and that became the main channel for the river. An island was formed in the interior of the U by the new and old channels completely surrounding it. Attached as an exhibit to this opinion is a depiction of the river.

¶29. It is undisputed that the old river channel remains basically where it has always been located, but it long ago stopped being the main channel. An expert testified that in 1942 a 170 foot wide stretch of sand divided the river at the neck of the bow, but the force of the river was digging a channel across that barrier. At the time of a 1952 aerial photograph the obstacle was gone. "There would have come a point in time when the remaining material [at the neck] would have been removed rather rapidly. Probably in a few days or weeks the new channel would have been complete. But it would have taken years to get to that point." Once the new channel was cut all the way through the sand, this witness testified that it "very rapidly" became the main channel of the river.

¶30. The expert testified that the removal of the stretch of sand was by a process of erosion, with the sand then accreting to an existing bank. This accretion apparently occurred on the bank at the river's initial sharp bend to the southwest. The erosion severed the tract from the land to the north, but alluvion did not form the island. The tract was always present and identifiable. The expert was allowed to testify that the change in the river was a result of "accretion."

¶31. It was upon this testimony that the trial court relied. The chancellor and this Court on initial resolution determined that due to accretion principles, title to the tract changed when it became an island. I find the testimony and accompanying exhibits to be convincing as to how and when the new channel formed. Certainly there was evidence that erosion cut a channel, and that sediment from that erosion was deposited along the bank. However, to use the word "accretion" then to explain the title to the island itself collapses into one issue what is in fact two.

¶32. The first issue arising from this river's action is to determine the title to the deposits of sediment resulting from the erosion. Those are accretions and are owned in common with the land to which they attached. That ownership has not been contested here nor was it below.

¶33. The second issue is to decide ownership of the island that was left in the middle, which has accreted to nothing at all but initially remained afloat. That is the dispute that has been brought to us. We have declared this tract that is surrounded by the two channels of the river to be the property of the land-owner who initially was to the south and west of the river. The person to whom we have awarded title did not have anything added to his land. At the moment that title is said to have changed because the new channel became dominant, nothing had yet occurred on his side of the river. The river still flowed in front of his property very much as it always had. A new channel now separated two parts of what was, and I say remained, his neighbor's land.

¶34. I agree that to declare ownership as we do, this has to be an accretion. Accretion denotes the process by which an area of land is increased by the gradual deposit of soil due to the action of a river, lake, or tidal waters. The reason for the accretion principle is said to be to keep constant a land-owner's access to the river, i.e., to preserve riparian rights. If his boundary line did not follow the increase, with the first noticeable accretion he would be trespassing to get to water.

¶35. An overview of the various doctrines is this:

> The doctrines of accretion, reliction, erosion, and avulsion provide simple, time-honored rules to apply to boundaries and land titles affected by the movement of water. Lands are accreted when previously eroded soil, silt, or gravel is deposited to increase the banks of bodies of water. Lands are relicted when water bodies recede, exposing formerly submerged lands. Lands are eroded when

water encroaches and wears away the banks of bodies of water. Accretion, relictions, and erosion bespeak a process and not a result. "Gradual" and "imperceptible" are the key words applied to accretions, reliction, and erosions. Similarly, avulsion is not the deposit or loss of deposit, so much as it is the process whereby land is accreted, relicted, or eroded suddenly. "Rapid" and "dramatic" are the key words for avulsions.

Phillip M. Lear, *Accretion, Reliction, Erosion and Avulsion: A Survey of Riparian and Littoral Title Problems,* 11 J. Energy Nat. Resources & Envtl. L. 265, 284 (1991). An accretion involving the deposit of "previously eroded soil" simply has not occurred here under anyone's construction of the facts except as to some incidental land not in question in this appeal. Those deposits of eroded soil are called "alluvion." There land in question was not formed by alluvion.

¶36. The previous lengthy quote refers to avulsions as "rapid," a matter to which I will return. The same author gives these examples of avulsions: "(1) A river breaking through the narrow neck of an ox bow, bypassing the former ox-bowed channel; and (2) sudden deposits due to floods or storms, or the creation of a natural lake when a mud slide dams a stream." *Id.* at 281 (footnotes omitted).

¶37. The tension in this case is to identify precisely the factors that distinguish accretions and avulsions. Is the *speed* at which the change occurs most important, or the *process*? If speed is the focus, is it the speed by which a new channel was dug by the action of the river, or the speed once there was a new channel that the old channel was displaced? Process would focus on whether the river advanced directly into a new channel or instead changed course by degrees through erosion in one place and replacement by deposit of sediment in another. Our supreme court's references to the doctrine use both elements, speed and process. "Rivers shift imperceptibly through accretion and reliction, or violently through flood or avulsion, and where their channels change their bottoms silt in and lose their depth." *Dyers v. Sillers,* 557 So.2d 486, 500 (Miss. 1990). "Accretion or alluvion is an addition to riparian land made by the water to which the land is contiguous," done gradually and imperceptibly. *Sharp v. Learned,* 195 Miss. 201, 14 So.2d 218, 220 (1943). What these quotes do not contemplate is a slow change of channel that affects nothing in between the old and new channels, or a fast erosion that sweeps everything away in between.

¶38. In applying these definitions, I do not accept that the important event here was gradual. The meander line of the river did not gradually change. For years the river was undertaking an excavation project at its sharp bend, but the river continued to flow in an unchanged course around the ox bow. The slow excavation was not changing the river's course gradually or otherwise, but only increasing the potential for a later change. At a certain moment, one not easily pin-pointed but nonetheless logically it must have existed, the meander line moved to the new location because the new channel finally was completed and became the dominant one. According to the testimony, that change occurred soon after the river broke through at the old sand barrier. That suggests the rapidity of an avulsion even if speed is the focus.

¶39. The fact that later the old channel started to fill up with silt does not alter that the original change was an avulsion. As the United States Supreme Court held, the gradual filling up of an old channel abandoned as a result of an avulsion is not itself considered an accretion but is an ultimate effect of the avulsion. *Arkansas v. Tennessee,* 246 U.S. 158, 175 (1918). Otherwise, the legal consequence of declaring a river's change to be an avulsion, namely, to leave title boundaries unchanged, would be overturned by what occurred later in the neglected channel.

¶40. We must determine into what category to place the initial change that was in place by the early 1950's,

irrespective of what occurred thereafter in the lesser-channel.

¶41. Regardless of whether this is considered a rapid change, there is case law that explicitly focuses on the *process* of change and concludes that an accretion can be sudden and an avulsion slow. One court held that "the definition of accretion requires that a river, in the process of moving its channel location from one place to another, erode the land between its present and former channels and replace the eroded land with alluvion."*United States v. Wilson,* 433 F.Supp. 57, 63 (N.D. Iowa 1977). *Wilson* also held this:

> where a river changes its main channel, *not by excavating, passing over, and then filling the intervening place* between its old and its new main channel, but by flowing around this intervening land, which never becomes in the meantime its main channel, and the *change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel,* and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream.

*Id., quoting Commissioners of Land Office of Oklahoma v. United States*, 270 F. 110, 113 (8th Cir. 1920)(emphasis added). *Accord, State v. Ecklund,* 23 N.W.2d 782, 789 (Neb. 1946).

¶42. Another case held this:

> Only where the thalweg [principal navigation channel] gradually moves through the intervening land as a direct consequence of erosion and the imperceptible process of accretion to the forming bank do the policies underlying the accretion and avulsion rules justify altering permanent land boundaries to conform with the gradually changing thalweg.

*Omaha Indian Tribe, Treaty of 1854 with U.S. v Wilson,* 575 F2d 620, 638-39 (8th Cir. 1978), vacated on other grounds, 99 S.Ct. 2529 & 3092 (1979).

¶43. Simply put, the accretion designation applies when the river munches through the intervening land as it reaches it new course, rapidly or slowly. It erodes land on one side and alluvion is desposted on the other. Avulsion occurs when the river finds a new channel without eroding the land between its old and new course. The distinction can be likened to a garden hose lying curved in the yard. Accretion would be the gradual straightening of the hose while it remains on the grass, uprooting dogs and cats, disturbing the grass, and otherwise touching everything between its old and its new location. Avulsion in the context of a new channel's being dug while the old one remained flowing would be splicing in a new section of hose without disturbing any of the old.

¶44. Some avulsions do not fit well my hose analogy. A violent flooding that changes the course and may (but need not) even move the river channel through everything in between is more like a hose bursting. The water then digs a new channel outside the hose, finally boring back into the hose at a location down-"stream." The spraying water may temporarily cover the ground in between and much of the rest of the yard as well, regardless of whether it gouges out all intervening grass.

¶45. Either could be done quickly or slowly, but almost always accretion is slow and avulsion is fast. To

make the point clearer, I will examine some treatises that explain these doctrines.

¶46. The "gradual and progressive change of the bed" that results from erosion and the depositing of alluvion was contrasted with situations in which a "river by accident merely natural, turns entirely out of its course" and runs in a new direction. Ray H. Skelton, The Legal Elements of Boundaries and Adjacent Properties 341 (1930), § 298, quoting *Nebraska v. Iowa*, 143 U.S. 359, 366-67 (1892). In the latter situation, no change in title occurs. Skelton at 341. Rapidity of the change was initially one of the critical elements, but later cases stated that the time element was only one factor and "the manner in which the change occurs is conclusive." *Id.* at 342-343.

¶47. Another authority defined "accretion" as the "act of depositing, by gradual process, of solid material in such a manner as to cause that to become dry land which was before covered by water. The material thus deposited is called 'alluvion.'" 5A George W. Thompson, The Modern Law of Real Property 1 (1978) § 2560. Again, there is no evidence here that any gradual depositing of alluvion ever occurred. The island was detached from its former moorings but has always existed as an identifiable parcel of property. It appears that for years and perhaps decades the new island had no dry land bridge to the land of the owner to whom this lawsuit has awarded title. That is unlike any other case of an "accretion" that I have discovered.

¶48. In conclusion, I return to the reason that the majority finds this to be an accretion. It is that this change was gradual. However, when using words such as "gradual and imperceptible," we should focus on the context for their use. What was gradual in the present case was the carving of a new channel. During this "gradual" period nothing relevant was occurring in the old channel at all. If we consider a change in the *location* of the river as the matter that must be either gradual or rapid, then during the years that the new channel was being dug, the location of the primary river channel was not changing at all. A potential was forming, but there was not yet reality.

¶49. The United States Supreme Court makes that focus clear in this statement:

> The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on.

*County of St. Clair v. Lovingston,* 90 U.S. 46, 68 (1874). Though progress in the cutting through of a new channel might have been perceived over time by occasional visitors to the sandy barrier, that slow excavation was not gradually changing the course of the river. It is as if for thirty years someone was digging across the top of the with a shovel and then finally makes it. The owner on the bottom of the would not have observed anything until after water finally started to flow all the way through the shallow new channel, fairly quickly deepened it and then made it dominant. None of this is an accretion, i.e., addition to land by depositing alluvion.

¶50. Knowing which channel was the principal one at various dates around 1950 would be a difficult but entirely irrelevant fact issue today. The transformation, probably governed by the channel that the largest amount of water takes, is instantaneous. At one moment more water is going in the old channel, the next moment more is going in the new. For awhile which is the main channel may alternate. Yet over what was said to be a brief period of time, the new one's dominance becomes permanent. Or as permanent as a river ever can be.

¶51. I would reverse as I find that the severance of the island was an avulsion. I would also remand so that the factual issues of adverse possession may be explored.

**MCMILLIN, C.J., IRVING, AND LEE, JJ., JOIN THIS SEPARATE OPINION.**

